435 F.2d 1133
 1 ERC 1460
 NOR-AM AGRICULTURAL PRODUCTS, INC., and Morton
International, Inc., Plaintiffs-Appellees,
v.
Clifford M. HARDIN, Secretary of Agriculture, G. W. Irving,
Jr., Administrator Agricultural Research Service
and Harry W. Hays, Director Pesticides
Regulation Division,
Defendants-Appellants.
 No. 18478.
 United States Court of Appeals, Seventh Circuit.
 July 15, 1970.
 
 Thomas A. Foran, U.S. Atty., Chicago, Ill., Howard S. Epstein, Atty., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants; Harold M. Carter, Director, regulatory Division, Raymond W. Fullerton, Atty., Regulatory Division, Dept. of Agriculture, Washington, D.C., of counsel.
 Holland C. Capper, Chicago, Ill., for plaintiffs-appellees; Robert B. Gerrie, James H. Ryan, Geoffrey G. Gilbert, McBride, Baker, Wienke & Schlosser, Chicago, Ill., of counsel.
 Before SWYGERT, Chief Judge, and CUMMINGS and PELL, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 This is an appeal from an order of the District Court granting plaintiffs' motion for a preliminary injunction enjoining the appellants (the Secretary and other personnel of the United States Department of Agriculture) along with each person acting under the authority or direction of the appellants, and any employee or agent of the Department from taking action, the purpose of which would be in effect to interfere with the sale, distribution, or manufacture of certain agricultural seed treatment products containing mercury compounds and generically referred to as Panogen products. The plaintiffs, Nor-Am and Morton, are the seller and manufacturer respectively of the products involved.
 
 
 2
 If this were the ordinary situation involving an appeal from an interlocutory order granting a preliminary injunction, the sole issue before this court would be whether the District Court abused its discretion in allowing a preliminary injunction. Further, it is clear that reversal would not be authorized nor would the decree be subject to modification unless abuse of discretion was clearly shown. Mytinger & Casselberry, Inc. v. Numanna Laboratories Corp., 215 F.2d 382, 384 (7th Cir. 1954).
 
 
 3
 Professor Wright has stated the matter well as follows:
 
 
 4
 'The trial court has considerable discretion in determining whether the situation requires the preservation of existing conditions through a preliminary injunction and the more deliberate conclusion of the appellate court that the ultimate decision may be against the party that obtained preliminary injunction does not warrant reversal of the interlocutory order. Reversal on such an appeal can be only for abuse of discretion.' 3 Barron & Holtzoff, Federal Practice and Procedure 1440 at 510 (1958).
 
 
 5
 Indeed, there is some authority to the effect that the only requirement is that a prima facie case be made. See: 43 C.J.S. Injunction 192 p. 898 (1945). We would have little difficulty in affirming the District Court's order on the basis of the pleadings and evidence before the court if this were the ordinary type of case, but it is not. We are confronted at the outset by the strongly urged contention of the Department that this is an attempt to secure a judicial review of administrative proceedings and that the District Court lacks jurisdiction so to do.
 
 
 6
 It is not contended by the Department that the administrative action taken by the Secretary pursuant to 7 U.S.C. 135 et seq., is immune from judicial scrutiny. The Department concedes otherwise but contends that judicial intervention into the administrative process created by Congress in the particular statute is not appropriate at this time because a court should not grant injunctive relief unless and until the appropriate administrative procedure is exhausted.
 
 
 7
 Conversely, the plaintiffs contended in the District Court and now contend that the particular order of the Secretary was arbitrary and capricious and by its nature had achieved a finality permitting judicial review under 5 U.S.C. 701 et seq. as well as pursuant to the inherent equity powers of the court.
 
 
 8
 To resolve the conflicting contentions, it is necessary to turn in some detail to the facts as adduced at the hearing before the District Judge.
 
 
 9
 It is to be noted that there was some complaint by the Department that it was hampered timewise in its preparation for the hearing below; however, the District Court did offer the Government a chance to bring in additional evidence and did grant additional time to permit the preparation of a motion to dismiss, which motion was denied at the time of the granting of the preliminary injunction. At the conclusion of the testimony, including that by the defendant Hays, the District Judge inquired of counsel for the Department as to whether the Department intended to present evidence, presumably referring to further testimony or other evidence. Counsel indicated he was going to confer with other counsel and the matter having been continued for several days no further testimony was offered. Since the Department contends that its personnel did not act arbitrarily or capriciously but on a basis of fact, presumably the matters on which the order in controversy was based were available for presentation. In any event, the Department on this appeal does not appear to be resting its claim for reversal on a claim of not having had a fair opportunity of presenting evidence available to it.
 
 
 10
 In considering the evidence before the District Court we are not, as we have heretofore indicated, considering this as the ordinary case in which the only inquiry is that of whether discretion was abused. Nevertheless, we are not unmindful that another 'ordinary' rule of procedure is applicable. We are referring to the principle that on an appeal from the granting of an interlocutory order of preliminary injunction the evidence will be considered in the light most favorable to the appellee.
 
 
 11
 This court has so held in analogous situations without feeling the necessity for the citation of authority. Seifert v. Solem, 387 F.2d 925, 929 (7th Cir. 1967).
 
 
 12
 As a matter of fact, the proposition that the court on appeal will presume that the trier of facts resolved the conflict in favor of the party for whom its verdict was rendered, unless it is opposed to the physical facts or inherently incredible, will assume the truth of such party's evidence which will be viewed in the light most favorable to the verdict and will give the benefit of all inferences that may reasonably and legitimately be drawn therefrom is of such universality that 5 C.J.S. Appeal & Error 1562(4) beginning at p. 1225 has some twenty full pages of citations supportive thereof.
 
 
 13
 Panogen products are mercury compounds which have been continuously marketed by plaintiffs and their predecessors for approximately twenty years. The product is used in the agricultural community as a fungicide seed treatment to protect young seedlings such as oats, tomatoes, wheat, barley and sorghum, from soil borne fungi disease and systemic or seed borne diseases that carry from one generation to the next. By estimate, United States farmers had been benefited from 1949 through 1968 in an increased yield of crops raised from treated seed in an aggregate value in excess of eight billion dollars. A small amount of the product apparently goes a long way and the cost to farmers has been an average of approximately seven cents per planted acre per season. Testimony indicated there was no available satisfactory substitute for liquid methylmercury seed treatment products (including Panogen) which is as economical and efficacious for the treatment of seeds.
 
 
 14
 Sale of Panogen products amounts to about $4000 per day. Panogen products are economic poisons within the meaning of 7 U.S.C. 135, et seq., being the Federal Insecticide, Fungicide and Rodenticide Act, of which the Secretary is chargeable with the administration. The statute requires the registration of economic poisons and the Panogen products in question were duly and properly registered under the statute. Plaintiffs and their predecessors for some years prior to being required to do so by the United States Food and Drug Administration have included a distinctive red dye in their formulations to give warning and for the purpose of preventing either deliberate or accidental misuse of treated seed or by-products as human food or animal feed. All of the Panogen products were labeled, the labels showing in red letters 'poison treated' and containing a skull and crossbones. In addition, the labels contained warnings that the seed treated with the Panogen products was not to be used for feed, oil or food purposes and might be fatal if swallowed and might produce delayed chemical burns. Warnings further admonished against breathing dust or getting near eyes or skin. Antidotes were specified on the warning labels. Labels were not only prepared for direct use on the product but for use on containers containing treated seed.
 
 
 15
 For the purpose of the hearing below only, the following facts were assumed to be true. On or about August 1969, a hog raiser in Alamogordo, New Mexico, obtained waste grain products which had been contaminated with a fungicide or fungicides containing mercury. The waste grain products were fed to approximately seventeen hogs as a supplement to their diet which also included cooked garbage. After approximately one month of feeding all of the hogs with the contaminated material, one hog (after it showed signs of illness) was butchered for family food and the meat was eaten by seven of the nine family members from September through December. In October 1969, fourteen of the remaining hogs owned by the family became ill, with blindness and a gait disturbance. Twelve of these hogs died and two became blind In December 1969, three of the family members who had eaten the hog became permanently injured from mercury poisoning.
 
 
 16
 On the evening of February 17, 1970 there was a national television broadcast on the Huntley-Brinkley newscast which discussed and portrayed the Alamogordo, New Mexico, incident. Doctor Hays, the Director of the Pesticides Regulation Division of the Department, to whom authority in the area involved had been delegated, did not see the program but was aware of it on February 18, 1970. On that date he sent Nor-Am a telegram which stated in part that in view of the recent accident (referring to the Alamogordo incident), Nor-Am was notified that registration of products containing the mercury compound for use as seed treatment was suspended. Such products were to be recalled from the market and further shipments were to be unlawful. A letter was to follow.
 
 
 17
 In the letter elaborating on the telegram, which letter also bore the date of February 18, 1970, in addition to reference to the Alamogordo incident, it was stated that other incidents had been reported which showed that mercury treated seed screenings and sweepings had been fed to livestock or disposed of in a manner that resulted in wildlife feeding on them.
 
 
 18
 At a later time and prior to hearing below, the order of recall was suspended in view of the practical difficulty of safely disposing of the compound other than through ordinary use channels. No further products, however, were to be distributed from the manufacturer.
 
 
 19
 The Director's action was taken pursuant to the 1964 amendment of the statute which generally permitted the Secretary of the Department of Agriculture to have the same type of power as the Secretary of Health, Education and Welfare has in food and drug cases. Specifically, the statute, 7 U.S.C. 135b(c), provides:
 
 
 20
 'Notwithstanding any other provision of this section, the Secretary may, when he finds that such action is necessary to prevent an imminent hazard to the public, by order, suspend the registration of an economic poison immediately.'
 
 
 21
 While the Department contends that the Alamogordo incident was not the sole actuating factor in the suspension of the registration order under the 'imminent hazard to the public' power, it is certainly a fair inference, and one in which we are entitled to indulge at this juncture, that the New Mexico incident really triggered the order. Other persuasive support for the order is not found by us in the record before us.
 
 
 22
 After some colloquy on the form of the question, Doctor Hays, on cross examination, stated that so far as he was aware at the time the telegram was sent he knew of no permanent injury resulting from the use of Panogen per se. With regard to Alamogordo, Doctor Hays testified that he 'visited the area and discussed the entire investigation going on during the latter part of December and early January.' Hays admitted that as of February 18, the date of suspension, he assumed the product involved was Panogen and assumed that the case involved accidental misuse rather than intentional misuse. He was sure tests were available to identify Panogen but admitted that no such tests had been conducted. Hays had met with the representative of plaintiffs on February 25, 1970, and at that time discussed with him 'alkyl mercury accidents' in other states. These incidents were reported in Oregon and California. On further testimony, however, he indicated that he did not know at the time of the Oregon incident what form of mercury it was, that when he had talked to the plaintiffs' representative he was talking about mercury in general. He reported that the Fish and Game Office in California had found pheasants with high levels of mercury in their tissues and also that mercury had been found in pheasants and quail in the area, 'I believe,' of Cincinnati. The witness believed that the mercury in large part was from the eating of seeds that had been sown in the field. About the greatest degree of specificity realized by Doctor Hays with regard to other bases for the order in his testimony was the statement that there was an inadequate degree of control over the use of the product by the fact that there had been numerous reports of treated seed getting into food and feed. His further testimony, however, indicated that he predicated this statement upon the number of seizure actions that had been taken in the past by the Food and Drug Administration when treated seed was found in grain.
 
 
 23
 The Director further stated that it was a matter of conjecture as to whether it really was possible to prevent treated seed from getting into 'these channels, and on this basis it is my feeling that it is a undue risk for the public.' The witness, however, was unable to supply the figures on the number of seizures supposedly made of grain in which treated seed was found in the year 1969.
 
 
 24
 A representative of the companies involved met with Doctor Hays in Washington shortly after the telegram was sent and interrogated the Director with regard to the alleged incidents of animal poisoning in Oregon, California and Texas. He stated that the companies had no information regarding these facts and asked what he could be told regarding them. Doctor Hays asked a member of his personnel to get the information and the assistant returned with a manila folder and said that Panogen was not involved in the Oregon incident. He further supplied the fact that the only information they had regarding the California incident was the newspaper clipping which mentioned mercury poisoning of birds, and there was no information on the Texas incident. This, according to the witness, is 'all the information we have ever learned in regard to that allegation for being one of the reasons for suspending Panogen.'
 
 
 25
 It is further to be noted that in the letter confirming the order of suspension, under the date of February 18, 1970, a statement is made that the 'directions for use and warning and caution statements on labels of the products were inadequate to prevent the treated seed screenings and sweepings from being fed to the hogs.' Reference presumably was to the Alamogordo incident although apparently no serious contention is being made by the Department that the warning labels do not clearly and explicitly state the danger involved in the misuse or even accidental use of the product. Rather the position of the Department seems to be that as long as the products are on the market no warning whatsoever can be conceived which would be adequate warning. This, of course, as a general proposition could be said to be true of any poisonous substance which has economic usefulness in the daily affairs of life.
 
 
 26
 Following briefing, the District Court entered its order of preliminary injunction which had the effect of staying the suspension of registration of the Panogen products. In addition, however, it was specifically stated in the order that it was being entered without prejudice to the Governmental defendants issuing a notice of cancellation with respect to the products in question in accordance with the law, but providing further that no cancellation should become effective prior to the completion of the administrative proceedings provided for by law including a public hearing. It is clear, therefore, that the Department was not in any way prevented from proceeding to hearings to determine whether the registration of the products in question should be continued. The only effect of the order was to prevent the Department from taking action against the manufacturing and distribution of the products pending the full administrative proceedings as provided for in 7 U.S.C. 135b(c).
 
 
 27
 On motion of the defendants this court, on May 20, 1970, stayed the preliminary injunction but ordered that the appeal be expedited.
 
 
 28
 Apparently on the assumption that the Alamogordo incident was caused by Panogen (although this assumption is not necessarily supported by persuasive evidence) the Secretary's order of February 18 applied only to Panogen. Other alkyl mercury products used for seed treatment manufactured and sold by plaintiff's competitors were not suspended until more than a month later. There was no indication if in fact the distribution of Panogen constituted an imminent hazard to the public, that the other alkyl mercury products were less hazardous to the public.
 
 
 29
 In this legal and factual context, we turn to a determination of whether the judicial intervention was jurisdictionally timely.
 
 
 30
 The possibility of judicial intervention or review was recognized well before administrative agencies achieved the major status in governmental operations occupied today.
 
 
 31
 As long ago as 1910, the first Mr. Justice Harlan stated the following:
 
 
 32
 'Learned counsel for the defendant suggests some extreme cases, showing how reckless and arbitrary might be the action of Executive officers proceeding under an act of Congress, the enforcement of which affects the enjoyment or value of private property. It will be time enough to deal with such cases as and when they arise. Suffice it to say, that the courts have rarely, if ever, felt themselves so restrained by technical rules that they could not find some remedy, consistent with the law, for acts, whether done by government or by individual persons, that violated natural justice or were hostile to the fundamental principles devised for the protection of the essential rights of property.'
 
 
 33
 Monongahela Bridge v. United States, 216 U.S. 177, 195, 30 S.Ct. 356, 361, 54 L.Ed. 435 (1910).
 
 
 34
 In the intervening years, as Congressional legislation creating administrative agencies has become more sophisticated and more prolific, ordinarily the enactment provides for judicial review, at least of some phases of the administrative action and ordinarily only after finality of administration action. The litigation that has developed has been concerned with efforts for judicial review at times or of areas not prescribed in the pertinent statutes. Many of the cases which have developed have involved what has sometimes been termed threshold intervention or review. Such intervention has been viewed with judicial alarm and has been typified as opening Pandora's box. See the dissenting opinion of Mr. Justice Fortas in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), and Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), in which he states after the reference to Pandora's box (at p. 176, 87 S.Ct. at p. 1531) that experience dictates on the contrary, that 'it can hardly be hoped some federal judge somewhere will not be moved as the Court is here, by the cries of anguish and distress of those regulated, to grant a disruptive injunction.'
 
 
 35
 While it would be hoped that such sympathy-motivated intervention by the federal judiciary would be at a minimal level, it is the duty of this court when threshold judicial intervention is sought to determine whether the very narrow area of permissive judicial review is involved or whether the action of the District Court has exceeded the proper jurisdictional periphery.
 
 
 36
 Support for the position of the plaintiffs in the case before us is not only found in the majority opinions in the Abbott and Gardner cases, supra, to which further reference will be made hereinafter, but also in the dissenting opinion of Mr. Justice Fortas. Thus, he states that the majority opinions are not based upon a finding that the procedures have been arbitrary or unreasonable (ibid at p. 175, 87 S.Ct. 1526). Further he emphasizes that courts should pass upon 'concrete, specific questions in a particularized setting rather than upon a general controversy divorced from particular facts' (ibid at p. 176, 87 S.Ct. at 1531). He concedes that there is residual judicial power in some extreme and limited situations to enjoin administrative actions even in the absence of specific statutory provision but contends that the majority opinion appears to proceed on the principle that even where no arbitrary procedure is involved, exercise of judicial power to enjoin allegedly erroneous regulatory action is permissible unless Congress has explicitly prohibited it, provided only that the controversy is ripe for judicial determination (ibid at p. 176, 87 S.Ct. 1526).
 
 
 37
 One of the cases principally relied upon in the present area is Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 82 L.Ed. 638 (1938). In that case there was an attempt to enjoin the National Labor Relations Board from holding a hearing upon a complaint of an alleged unfair labor practice. As the Court, through Mr. Justice Brandeis, points out in Myers, the Board procedure at the juncture there involved was statutorily exclusive. Of more significance, as distinguished from the case before us, is that in Myers there was no power to enforce the N.L.R.B. order in the administrative agency itself but to secure enforcement the Board had to apply to the Court of Appeals for affirmance. In these circumstances the Court reached the result that threshold judicial review would be disruptive of the administrative procedure and that the judicial review provided in the statute was adequate. The Court enunciates the well-established principle that the defending of a proceeding is not in and of itself irreparable damage for although lawsuits have often proved to be groundless 'no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact' (at p. 52, 58 S.Ct. at p. 464).
 
 
 38
 In Myers the plaintiff would eventually have his day in court during which his contentions could be adjudicated without having had interim irreparable damage other than having to defend through a series of proceedings. Not all National Labor Relation Board cases, however, are outside the scope of injunctive relief. Thus in Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), where the complaining professional employees had no other means to protect and enforce their rights, it was held that the district court did have jurisdiction of the injunction action.
 
 
 39
 This court has reached the Myers result, as it should have, where the Myers situation is involved. Vapor Blast Mfg. Co. v. Madden, 280 F.2d 205 (7th Cir. 1960), and Chicago Automobile Trade Association v. Madden, 328 F.2d 766 (7th Cir. 1964).
 
 
 40
 In Vapor Blast this court recognized that the district courts possess general jurisdiction under 28 U.S.C. 1337, citing Leedom v. Kyne, supra. Further, the court recognized that in certain instances the district court's jurisdiction will be invoked thereby precluding exclusive review by the provision of the appropriate statute. However, this court found that Myers was applicable, that the only irreparable injury claim was the expense of defending against the unfair labor practice complaint. The company in Vapor Blast had contended that the determination by the Regional Director of the N.L.R.B. to file an unfair labor practice complaint was an adjudication subject to intermediate judicial review under the then 5 U.S.C. 1009. The court held that the decision to file such a complaint is an example of the 'preliminary, procedural, or intermediate agency action * * * subject to review upon the review of the final agency action.' 1009(c), supra (now 5 U.S.C. 704). Likewise in Chicago Automobile the interlocutory order sought to be reviewed related to the N.L.R.B.'s case handling procedure and was not a determination which per se was not subject to review.
 
 
 41
 None of the cases (Myers, Vapor Blast and Chicago Automobile) involve as does the case at bar a situation where the preliminary administrative action placed the plaintiff in the position of either suspending activities which had theretofore been lawful or risking penalties of a severe consequential nature.
 
 
 42
 A more troublesome case in its possible application to the facts in the case before us is that of Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). In that case the plaintiff's products were actually seized by multiple libel suits without first affording a hearing on the probable cause issue. The libel procedure provided for by the statute in question was required to conform as nearly as possible to the procedure in admiralty.
 
 
 43
 It is significant in Ewing that the challenge was not to the seizure itself but to the determination, without hearing, of probable cause for the initiation of the suits. The company, however, by virtue of the initiation of the suits was in court and could raise questions for judicial determination. Actually, while the administrative agency made the probable cause determination, the exercise of the discretion as to whether suit should be filed was made by the Attorney General. The Court points out that determination of probable cause in and of itself had no binding legal consequence and the Court refused judicial review of such a preliminary step in a judicial proceeding as being so unique that they were unwilling easily to infer that such right existed. The right of the full hearing before the court when the libel was filed was held to satisy the requirements of due process. The result arrived at is entirely consistent with our decisions in Vapor Blast and Chicago Automobile to the effect that the administrative action there did not constitute final but only preliminary action.
 
 
 44
 In the case before us there may be, as a result of continuing administrative procedures, a final determination that the Panogen products should not be registered; but the Secretary's order on February 18, 1970, without hearing, was in our opinion a final determination on the matter of imminent hazard to the public. The fact that continuing administrative procedures might result in a further determination that the registration of the products should be reinstated is small solace to the company which in the interim has suffered substantial loss of profits as well as good will by the determination of imminent hazard to the public.
 
 
 45
 On the other hand, we fully recognize, as did the court in Ewing, the extreme importance of the protection of the public in the jurisdictional issue before us. Congress obviously had in mind in 1964 in granting the Secretary the power it did that the public health required on some occasions a speedy protection. We do not feel, however, that Congress intended that purported protection should be bottomed on a shaky foundation of arbitrariness or capriciousness.
 
 
 46
 In reviewing the decisions involving the present jurisdictional issue, the case which appears most analogous and persuasive in our opinion is that of Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507 (1967), in which the second Mr. Justice Harlan found in the words of the first Mr. Justice Harlan that the court was not so 'restrained by technical rules' that it could not find some remedy, consistent with the law, for acts done by the government that were hostile to the fundamental principles devised for the protection of the essential rights of property. Monongahela Bridge v. United States, 216 U.S. 177, 195, 30 S.Ct. 356, 361 (1910). There are differentiations between the Abbott case and the case before us, one of the principal ones being that the statute in Abbott expressly provided that the remedies in the subsection should be in addition to and not in substitution for any other remedies provided by law. While a comparable provision does not appear in the statute here involved there is on the other hand not an 'exclusive' provision as contained in the National Labor Relations Act. The statute here involved being silent on the matter, while not providing the fortification that it did in Abbott, does not conversely in our opinion preclude the judicial remedy in the appropriate case. Further, in Abbott an industry-wide order was involved whereas here we have a particularized order. The lack of a particularized order was one of the very factors objected to by Mr. Justice Fortas in his dissent as we have heretofore pointed out.
 
 
 47
 However, both in Abbott and the case before us, we have a situation 'in which the impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage.' (387 U.S. at p. 152, 87 S.Ct. at p. 1517). The choice as presented in both cases is that of complying with the order or following the present course and risking prosecution.
 
 
 48
 Under 7 U.S.C. 135f any person violating 135(a)(1), being the distribution, selling, or offering for sale an unregistered economic poison, shall be guilty of a misdemeanor and be fined not more than $1000.
 
 
 49
 Other penalties are specified in 7 U.S.C. 135f for violating any other provisions of the statute and upon conviction of a first offense a fine is specified of not more than $500 and upon conviction for each subsequent offense the fine will be not more than $1000 or imprisonment for not more than one year or both. While the amounts of the fines are not large, presumably a responsible business organization and its personnel are not readily desirous of being impaled on the dilemma as referred to by the Court in Abbott.
 
 
 50
 The United States Supreme Court also reached the same result on the same day in Gardner v. Toilet Goods Ass'n., 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), in which case the Court again emphasized the penalties for noncompliance.
 
 
 51
 On the matter of whether the 'imminent hazard to the public' order of the Secretary constituted a final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. 704, we find particular significance in the Court's statement in Abbott that the cases in dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way. (387 U.S. at p. 149, 87 S.Ct. 1507). The Court refers to an 'agency action' as including any rule defined by the Act as 'an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy.'
 
 
 52
 We find further fortification for our position in the decision of Chief Judge Bazelon of the Court of Appeals for the District of Columbia in Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, 55 (1954), in which decision it is stated as follows:
 
 
 53
 'This court has jurisdiction to review only final orders of the Board. Whether or not the statutory requirements of finality are satisfied in any given case depends not upon the label affixed to its action by the administrative agency but rather upon a realistic appraisal of the consequences of such action. 'The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control.' Thus, administrative orders are ordinarily reviewable when 'they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.' Under this test, a final order need not necessarily be the very last order.'
 
 
 54
 It is true that 10(c) of the Administrative Procedure Act (5 U.S.C. 704) provides in part that final agency action for which there is no other adequate remedy in a court is subject to judicial review, but a preliminary, procedural or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. However, we construe this as did both the committees on the judiciary of the House and Senate, to mean that 'final action' includes any effective agency action for which there is no other adequate remedy in any court. Deering Milliken, Inc. v. Johnston, 295 F.2d 856, 865 (4th Cir. 1961).
 
 
 55
 The Department contends that the cases hold that the courts are not authorized to review administrative action that is committed to the discretion of a governmental agency by the terms of a 'permissive type' statute. The Department here relies upon the use of the word 'may' with regard to the Secretary's statutory power to suspend when he finds such action is necessary to prevent imminent hazard to the public. The statement of unreviewability of discretionary administrative acts does appear, it is true, in the cases but the cases do not, in our opinion, go to the extent of placing arbitrary or capricious acts beyond the ambit of judicial review.
 
 
 56
 The Department cites as a typical case in support of its position United States ex rel. Walther v. District Director of Imm. & Nat., 175 F.2d 693, 694 (2nd Cir. 1949). This brief decision involving the power of the Attorney General to suspend in certain circumstances deportation of an alien, asserts, without elaboration, that the word 'may' in a statute confers discretionary unreviewable power.
 
 
 57
 We accept and adopt what to us is the better reasoned approach of Chief Judge Bazelon in the recent case of Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1097, 1098 (D.C.Cir. May 28, 1970) in which he states the following:
 
 
 58
 'Related to the question of standing is respondents' argument that the decision to suspend the registration of a pesticide as an 'imminent hazard' is committed by statute to unreviewable administrative discretion. Even if petitioners have standing to seek review of some administrative decisions under the FIFRA, respondents contend that they cannot seek review of a decision on emergency suspension. Preclusion of judicial review is not lightly to be inferred, however; it requires a showing of clear evidence of legislative intent. That evidence cannot be found in the mere fact that a statute is drafted in permissive rather than mandatory terms. Although the FIFRA provides that the Secretary 'may' suspend the registration of an economic poison that creates an imminent hazard to the public, we conclude that his decision is not thereby placed beyond judicial scrutiny.'
 
 
 59
 Reliance in the cases indicating non-reviewability of administrative discretion is apparently based upon the language of the Administrative Procedure Act (5 U.S.C. 701(a)(2)) to the effect that excepted from judicial review is agency action committed to agency discretion by law. However, the recent case of Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), held that the permissive term 'as he may deem proper' by itself is not to be read as a congressional command which precludes judicial determination. We find nothing in the controlling statute under which the Secretary was operating which expressly precludes review.
 
 
 60
 Also, the legislative history of the term 'imminent hazard to the public' appears to be supportive of the plaintiff's position that the Secretary's suspension order is not beyond the scope of judicial review. The term appeared in federal legislation in 'The Drug Amendments of 1962,' an act amending the Federal Food, Drug and Cosmetic Act. Under that statute the 'imminent hazard' finding is required for the summary suspension of a license to market drugs, if the suspension is to be effective prior to hearing. While the legislative history of the 1964 amendment to the Federal Insecticide, Fungicide, and Rodenticide Act, giving the Secretary of Agriculture similar summary authority, does not seem specifically to contain a discussion of the concept of 'imminent hazard' it does refer to the fact that the new procedure is modeled after that contained in the Federal Food, Drug and Cosmetic Act. Viewing the similarity of the language utilized and the purposes for which it was intended, it seems clear that the language in both acts should be similarly interpreted.
 
 
 61
 The Senate report on the 'Drug Amendments of 1962' reflected that an imminent hazard to the public health would exist when the evidence before the Secretary showed that a drug was so unsafe as to create a public health situation 'which must be corrected immediately, and cannot be permitted to continue while a hearing is being held.' The Committee contemplated that the power would be exercised only in the exceptional case of an emergency which did not permit the Secretary to correct it by other means. S.Rep. No. 1744 (pt. 2), 87th Cong.2d Sess. 7 (1962). As Senator Eastland elaborated in his prepared report on the Senate floor:
 
 
 62
 'The committee believes that this authority, which could have grave effects upon a manufacturer and upon the confidence of the public in a drug which might later be found appropriate for continued availability to physicians, should only be exercised under the most extreme conditions and with the utmost care.'
 
 
 63
 108 Cong.Rec. 17366 (1962).
 
 
 64
 Similarly the House of Representatives Report on the same provisions stated in part that it would be expected that in exercising the imminent hazard authority the Department would make every effort, within the limits of its public responsibility, to notify the applicant and allow him to advance arguments why summary suspension was not required, or after suspension has been invoked, why it might safely be withdrawn pending the hearing. H.R.Rep. No. 2464, 87th Cong.2d Sess. 8-9 (1962).
 
 
 65
 While it is apparent that the Department has been concerned with the environmental impact of the use of mercury products, it is certainly much less clear that the data available to the Department, at least insofar as our record is concerned, indicated the necessity for emergency action as opposed to continued and in-depth analysis study.
 
 
 66
 The present prevailing approach to the type of case we have here involved seems clearly to be that there is no presumption against judicial review and in favor of administrative absolutism unless that purpose is fairly discernible in the statutory scheme. Association of Data Processing Service v. Camp, 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).
 
 
 67
 An examination of the controlling statute, 7 U.S.C. 135b(c)(d), poses one problem which requires disposition. In subsection (c) final orders of the Secretary under 'this section' shall be subject to judicial review in accordance with the provisions of subsection (d) 'of this section.' In the following subsection (d) it is stated that in a case of actual controversy as to the validity of 'any order' under 'this section,' any person who will be adversely affected by such order may obtain judicial review by filing in the United States Court of Appeals for the circuit wherein such person resides or has his principal place of business, a petition praying the order be set aside in whole or in part. The language pertaining to review contained in subsection (c) would seem to be meaningless in view of the fact that a complete right of review is given in subsection (d) 'of any order' which might be construed to pertain to any order, either preliminary or final. Counsel, during argument, suggested that perhaps the language in subsection (c) while somewhat repetitive of the review language in subsection (d) perhaps was inadvertently so and came about from the fact that the primary purpose was to carry over into the Federal Insecticide, Fungicide and Rodenticide Act the powers that the Secretary of Health, Education and Welfare has under the Food and Drug Act and that the unnecessary review provision came along as a part thereof.
 
 
 68
 A more troublesome question is whether Congress intended that the review of 'any order' was confined to the Court of Appeals. At one point in the proceedings below, counsel for the plaintiffs stated that one of the positions taken by the Government is that the companies should have gone to the Court of Appeals. However, counsel for the Department stated that this was not the Government's position and such position was not asserted before us on this appeal. Nevertheless, we feel it is necessary to dispose of this phase of the matter and we do so by determining that the terms of the statute do not necessarily preclude initial review by the District Court of administrative action claimed to be arbitrary and capricious. This is so under the inherent equity power of the District Court and the cases referred to in this opinion interpreting the Administrative Procedure Act, 5 U.S.C. 701 et seq.
 
 
 69
 There is some authority to the effect that only a trial court is capable of reviewing orders issued without benefit of formal factifinding based on a record. See Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1093 (D.C.Cir.1970). We do not need to decide the question here as in our view the District Court did have jurisdiction. We do not intend to hold, on the other hand, that 'any order' irrespective of finality, as could be argued under subsection (d), is reviewable by this court. Our decision, as previously indicated, is on a much more narrow ground than that.
 
 
 70
 While our attention is directed to the controlling statute, we also note the language of subsection (c) giving the Secretary the power of suspension 'when he finds' that such action is necessary to prevent an imminent hazard to the public. It has been suggested that whenever property rights or personal rights protected by the Constitution are in issue in judicial or quasi-judicial proceedings, the duty to 'find' facts may well imply the duty to accord a hearing, Ex parte Anderson, 191 Or. 409, 229 P.2d 633, 648 (1951). We do not here so hold. We are, however, of the opinion that an 'imminent hazard' order rendered without hearing should be based upon a far greater factual foundation than the record discloses in the case before us.
 
 
 71
 The Department asserts in reliance upon Saferstein, Non-Reviewability: A Functional Analysis of 'Committed to Agency Discretion,' 82 Harv.L.Rev. 367 (1968), that the delay incidental to judicial review and an attendant injunction could well be costly to public health and welfare. While this is in the nature of a speculative statement only, it is further to be noted that the author lists a complex of eight factors in determining how great a burden the review places on the courts and agencies and how great the likelihood that unfairness would escape uncured if review is denied. The possible injurious effect from delay was in connection with one point only of the Saferstein article and that was the need for expeditious operation of congressional programs. The other seven factors we deem are worthy of consideration and are as follows: Expertise and experience required to understand the subject matter of agency action, managerial nature of agency, impropriety of judicial intervention, necessity of informal agency decision making, inability of reviewing court to ensure correct result, quantity of potentially appealable agency actions and existence of other methods of preventing abuses of discretion. A balancing of all of the above factors fails to persuade us that the case before us is one of non-reviewability.
 
 
 72
 The plaintiffs contend that the Department has admitted the Secretary's order was arbitrary, capricious and contrary to law. This apparently is based upon the fact that a motion to dismiss was filed below pursuant to Rule 12(b)(6), which is in essence that the complaint failed to state a cause of action.
 
 
 73
 The particular motion to dismiss has evolved from the common law general demurrer which admitted all well-pleaded facts. This principle has generally been carried over to the motion to dismiss with the result that the allegations of the complaint on consideration of the motion to dismiss are taken as true. However, this court has recognized that the motion to dismiss admits the well-pleaded facts only to the extent of applying the tests of the legal sufficiency of the complaint, Economy Food & Liquor v. Frankfort Distillers Corp., 232 F.2d 410 (7th Cir. 1956). Furthermore it is clear that not all allegations in the complaint must be accepted by the court in considering the motion to dismiss. Basically the court is required only to accept conclusions stated in the complaint which may be reasonably inferred from the facts presented, 5 Wright & Miller, Federal Practice & Procedure, 1357 (1969).
 
 
 74
 Analogizing the present case to the principle that general charges of bad faith without allegation of facts sufficient to support them are not admitted on demurrer, Dealtry v. Selectman, 279 Mass. 22, 180 N.E. 621 (1932), we question whether the legal conclusion that the Secretary's action was arbitrary and capricious would have to be accepted as true, per se, by the court considering the motion to dismiss.
 
 
 75
 In any event, this case is before us only on the basis of the direct appeal from the order granting the preliminary injunction and not on the basis of the court overruling the motion to dismiss. We therefore do not rely upon the claimed admission in determining whether the Secretary's order was arbitrary and capricious. Indeed, in the motion to dismiss the Department itself expressly denied that the Secretary's action was arbitrary and capricious.
 
 
 76
 In the ultimate administrative decision on the matter of the propriety of the registration of Panogen, there will of necessity have to be a balancing of the conflicting interests of the public. On the one hand is the desire of people to be free from any possible exposure to poisonous substances. On the other hand, we have the interest of the agricultural community in the use of a product most helpful and beneficial to their legal pursuit and one which in turn has apparently eliminated diseases to which seeds are susceptible thereby ultimately benefiting the public at large.
 
 
 77
 Certainly, many poisonous substances will be permitted to circulate in the public domain. A recent news release of the National Park Service referred to scraps of self-developing film containing a residue of emulsion that when dropped by vacationers had proved a killer of fish and wildlife. Yet, the littering habits of tourists just as the consumption of what appears to have been very obviously contaminated pork would not seem to indicate as a first step procedure the banning of the product involved from the market.
 
 
 78
 In any event, we do not here purport to balance the conflicting interests of the public. Rather we hold that, at the present juncture, the finding of the district court that the suspension of the registration was arbitrary and capricious is adequately supported on the record.
 
 
 79
 We do not in so doing intend to be critical of the Department or its personnel. They are charged with a grave responsibility for protection of the public and are presumably attempting to exercise the power given to the Department in a manner believed to be in the public interest, even though the decision was reached in the context of the emotionalism that could not help but have been engendered by the Alamogordo incident.
 
 
 80
 The decision we have reached will permit a rational and objective administrative procedure to go forward giving due weight to all phases of the matter, including that which is probably of long range concern to the Government, the ecological aspects. As stated by Judge Bazelon in Environmental Defense, Inc. v. Hardin, 428 F.2d 1100 (D.C.Cir.1970):
 
 
 81
 '* * * the statutory scheme of the FIFRA itself contemplates a lengthy inquiry into the conditions for the safe use of an economic poison before its registration may finally be cancelled.'
 
 
 82
 In supporting the finding of the District Court of arbitrary and capricious action, we do so in the sense in which those words were defined by Judge Holtzoff in O'Beirne v. Overholser, 193 F.Supp. 652, 656 (D.C.C.1961):
 
 
 83
 'The words 'arbitrary and capricious' are a technical legal phrase. They are not used in their popular sense and in this connection have no opprobrious connotation. In the eyes of the law an administrative action not supported by evidence or lacking a rational basis, is deemed arbitrary and capricious. Decisions of administrative officers may not be predicated on their personal desires or views, no matter how sincere they may be, O'Boyl v. Coe, D.C., 155 F.Supp. 581, 584.'
 
 
 84
 For the reasons hereinbefore set out, we hold that the District Court had jurisdiction, that there was a finality of administrative order sufficient to permit review and that upon that review the District Court's determination was correct. We therefore vacate the stay heretofore granted by this court and the order granting preliminary injunction by the District Court is
 
 
 85
 Affirmed.
 
 
 86
 SWYGERT, Chief Judge (concurring).
 
 
 87
 I concur in my brother Pell's opinion; however, I wish to add a few words of my own supporting the result we reach.
 
 
 88
 Panogen, the accused product, helps to prevent diseases affecting planted seeds of wheat, oats, cotton, and sorghum crops. There is no available substitute for the liquid methylmercury contained in Panogen that is as economical and efficacious for the treatment of these crop seeds. Panogen has been on the market since 1949 and, so far as the record shows, has been used safely during all that time.
 
 
 89
 The Alamogordo incident was a freak occurrence, the result of the combined negligence of the granary where the seed was treated and the head of the afflicted family. The tragic events came about through misuse rather than normal use of the treated grain. Accordingly, the district court correctly concluded, in my opinion, that the suspension order, based on this single, abnormal incident, was an arbitrary exercise of the Secretary's emergency authority under the statute.
 
 
 90
 I agree with Judge Bazelon in Environmental Defense Fund v. Hardin (D.C.Cir.1970) 428 F.2d 1098), when he said as to a converse but analogous problem in reference to the Act in question: 'Preclusion of judicial review (of a decision on emergency suspension) is not lightly to be inferred * * *; it requires a showing of clear evidence of legislative intent. That evidence cannot be found in the mere fact that a statute is drafted in permissive rather than mandatory terms. Although the FIFRA (Federal Insecticide, Fungicide and Rodenticide Act) provides that the Secretary 'may' suspend the registration of an economic poison that creates an imminent hazard to the public, we conclude that his decision is not thereby placed beyond judicial scrutiny.'
 
 
 91
 Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), although dealing with the preenforcement review of a regulation under the Federal Food, Drug and Cosmetic Act, supports reviewability of the emergency suspension order in the case before us. There the Supreme Court said: '(A) survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress,' supra, at 140, 87 S.Ct. at 1511. Then adverting to the Administrative Procedure Act the Court said, '* * * (that Act) provides specifically not only for review of 'agency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court.' 5 U.S.C. 704.' Supra at 140, 87 S.Ct. at 1511. Finally, the Court reaffirmed its view expressed in Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962), that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review.' Supra at 141, 87 S.Ct. at 1511. Neither the briefs nor the oral arguments point to any 'clear and convincing' evidence that Congress intended that arbitrary exercise of the Secretary's emergency suspension authority under the Act should be beyond judicial correction.
 
 
 92
 The Secretary's contention that the district court lacked jurisdiction because Nor-Am failed to exhaust the administrative remedies available to it does not survive analysis. The emergency suspension order was final administrative action in that it became effective immediately upon its issuance. The Act provides for no administrative review of that order in a 'pragmatic way.' Abbott Laboratories v. Gardner, supra at 149, 87 S.Ct. 1507. The expedited hearing provided by the Act following an emergency suspension contemplates a hearing before an advisory committee on whether 'the Secretary, in accordance with the procedures specified herein, may suspend or cancel the registration of an economic poison whenever it does not appear that the article or its labeling or other material required to be submitted complies with the provisions of this Act.' Such a proceeding is meaningless as a remedy to correct an arbitrary emergency suspension ordered issued without the benefit of a prior hearing before the agency. It provides no remedy for the irreparable injury which naturally flows from a suspension based on an abuse of the Secretary's discretion.
 
 
 93
 If it should be thought that Ewing v. Mytinger & Casselberry, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), restricts judicial review of the Secretary's action in this case, Abbott Laboratories has blunted the drastic implications which seem to accompany the Ewing decision. As pointed out in Abbott Laboratories 'the determination of probable cause in Ewing (had) 'no effect in and of itself,' 339 U.S., at 598 (70 S.Ct., at 872); only some action consequent upon such a finding could give it legal life.' Supra at 147, 87 S.Ct. at 1515. In contrast, the suspension order of the Secretary in the case before us was not a preliminary finding having 'no effect in and of itself.' Rather, it brought about the effective and immediate cessation of Nor-Am's business.
 
 
 94
 CUMMINGS, Circuit Judge (dissenting).
 
 
 95
 With all respect, I am compelled to dissent. I agree that preclusion of judicial review of administrative action adjudicating private rights is not lightly to be inferred. Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192; see also Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184. The issues presented by this appeal are, however, the proper time and forum for judicial review. Here both the clear command and purpose of the Federal Insecticide, Fungicide and Rodenticide Act preclude even this limited judicial review at this stage in the proceedings, by either the district court or the Court of Appeals. In light of the mandate of Congress and the interests at stake, I would require the completion of the administrative adjudication before permitting recourse to the courts.
 
 
 96
 The fundamental provisions of judicial review of administrative actions are contained in the 1946 Administrative Procedure Act (5 U.S.C. 701 et seq.). Section 10(c) of the APA governs which actions shall be reviewable:
 
 
 97
 'Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. * * *' 5 U.S.C. 704.
 
 
 98
 Included in the concept of the 'finality' of an agency order is the requirement that the administrative process be completed and recourse to administrative remedies exhausted as a precondition to recourse to judicial relief. See generally Davis, Administrative Law Treatise, 20.01 et seq. (1958 ed., 1965 Supp.); Jaffe, Judicial Control of Administrative Action, pp. 424-458 (1965). The principles underlying the development of this doctrine have long been settled. In Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 767-768, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796, the Court stated that
 
 
 99
 'The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings. Where Congress has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful function to anticipate the administrative decision with their own, whether or not when it has been rendered they may intervene either in presumed accordance with Congress' will or because, for constitutional reasons, its will to exclude them has been exerted in an invalid manner. To do this not only would contravene the will of Congress as a matter of restricting or deferring judicial action. It would nullify the congressional objects in providing the administrative determination. In this case these include securing uniformity of administrative policy and disposition, expertness of judgment, and finality in determination, at least of those things which Congress intended to and could commit to such agencies for final decision.'
 
 
 100
 These considerations are equally applicable to the emergency action taken by the Secretary in this case.
 
 
 101
 The 1964 amendments to the Federal Insecticide, Fungicide and Rodenticide Act (Pub.L. 88-305, 88th Cong., 2nd Sess.) greatly strengthened the ability of the Secretary of Agriculture to take affirmative action protecting the public from hazardous and mislabeled commodities. Congress enacted new powers to prevent, suspend and revoke registrations where previously the Secretary had been compelled to accede to registration under protest should he be faced with an adamant demand. Congress additionally extended the well-established administrative discretion of emergency action in the face of 'an imminent hazard to the public.' 7 U.S.C. 135b(c). In almost the same breath, however, Congress recognized the need for prompt determination of the accuracy of the Secretary's judgment and provided that in the wake of an emergency suspension the Secretary should
 
 
 102
 'give the registrant prompt notice of such action and afford the registrant the opportunity to have the matter submitted to an advisory committee and for an expedited hearing under this section. Final orders of the Secretary under this section shall be subject to judicial review, in accordance with the provisions of subsection d. * * *' 7 U.S.C. 135b(c).
 
 
 103
 At the same time, Congress enacted Section 135b(d) governing judicial review of the Secretary's orders regarding registration of 'economic poisons':
 
 
 104
 '(d) In a case of actual controversy as to the validity of any order under this section, any person who will be adversely affected by such order may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a petition praying that the order be set aside in whole or in part. * * * The findings of the Secretary with respect to questions of fact shall be sustained if supported by substantial evidence when considered on the record as a whole, including any report and recommendation of an advisory committee. * * * The commencement of proceedings under this section shall not, unless specifically ordered by the court to the contrary, operate as a stay of an order. The court shall advance on the docket and expedite the disposition of all causes filed therein pursuant to this section.'
 
 
 105
 These provisions outline the procedures, forum, and standards for judicial review. There is no basis for reading into the reference to 'any order' an implication that Congress intended to expand the scope of reviewable orders and permit immediate recourse to the courts without prior exhaustion of administrative remedies. In subsection (c) Congress specified which orders were to be reviewed by stating that 'final orders of the Secretary under this section shall be subject to judicial review, in accordance with the provisions of subsection d.' The language of Section 135b(d) must be construed in light of that directive.
 
 
 106
 Equally unacceptable is the contention that the emergency suspension order is susceptible to construction as a 'final' order of the agency made reviewable by either the specific provisions of Section 135b(c) or through the broad authorization of Section 10(c) of the Administrative Procedure Act (5 U.S.C. 704). The evident procedural scheme of the 1964 statute itself militates against such a construction. The statute expressly provides for special adjudicatory procedures to follow suspension. Emergency suspension, in every real sense, initiates rather than culminates the course of administrative activity. Furthermore, the statute calls for judicial review by the courts of appeals, not district courts. This review is to be based upon the findings of the agency resulting from its own factual deliberations and the application of its administrative expertise. Such provisions with respect to judicial review are classic indications that Congress required an administrative adjudication to precede judicial scrutiny. The provision in Section 135b(c) for a report and recommendation of an advisory committee also supports the conclusion that the administrative processes must be strictly observed.
 
 
 107
 There are no discernible 'pragmatic' considerations of policy or purpose to support describing this preliminary discretionary action as a 'final order.' The functional approach to the definition of finality suggested by the Court in Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, should not obscure the clear procedural scheme delineated in the statute. Abbott Laboratories, like the earlier decisions relied upon by the Court, involved the need for essentially declaratory review of agency rules and regulations which themselves represented the culmination of administrative legislation.' Entirely different considerations are operative where, as here, judicial review is sought from an order initiating adjudicatory proceedings by the agency. This distinction was expressly recognized by the Court in Abbott Laboratories when it distinguished Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, by noting that the
 
 
 108
 'drug manufacturer in Ewing was quite obviously seeking an unheard-of form of relief which, if allowed, would have permitted interference in the early stages of an administrative determination as to specific facts, and would have prevented the regular operation of the seizure procedures established by the Act.' 387 U.S. at p. 148, 87 S.Ct. at 1515.
 
 
 109
 The emergency suspension of the registration of an economic poison under Section 135b(c), like the seizure of articles scrutinized in Ewing, represents a highly discretionary administrative initiation of proceedings. Precipitant judicial review of such a tentative judgment would at best be a difficult matter of dubious social benefit. More important, it strains administrative resources at a stage in the process which is most delicate and to a degree which may ultimately be rendered unnecessary by ordinary agency operations. Even the limited review here contemplated nullifies the need or utility of the further agency action desired by Congress. As this record demonstrates, judicial review at this stage requires factual elaboration by the district court. Such bifurcation and duplication of governmental resources and efforts demonstrate the unwisdom of early judicial review. Once the district court has inserted itself into the process, it would seem wasteful or pointless to return the matter to the agency. Even limited judicial scrutiny of the accuracy and correctness of the Secretary's emergency suspension of registration largely abrogates need of expedition of further agency proceedings. At the very least, however, the agency must postpone its further proceedings (even if it plans ultimately to expedite them) pending the outcome of judicial review. Not only may this aggravate the harm suffered by the innocent registrant by prolonging litigation, it unnecessarily encumbers governmental efforts and may have the adverse effect of coloring further agency actions.
 
 
 110
 Nor can I accept the verdict of the judge below that the administrative remedies are inadequate as safeguards against irreparable injury to the innocent citizen. There is no reason to believe the administrative agency incapable of correcting an erroneous suspension without aid of the courts. There is no basis for concluding that expedition by the agency would be any less effective than expedition by the judiciary. Indeed, the expertise of the agency might well render it more adept at rectifying abuses in its suspension orders than courts. Unlike Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210, plaintiff can enforce its rights as a practical matter without judicial interruption of agency practices. Nothing in the nature of the objection raised by plaintiff in this case suggests that exhaustion of agency remedies would be an exercise in futility. Cf. McKart v. United States, 395 U.S. 185, 197-198, 89 S.Ct. 1657, 23 L.Ed.2d 194; Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507. Failure of the courts to entertain the complaint at this time does not foreclose judicial review entirely. See Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; cf. McKart v. United States, supra, U.S. 395 at p. 197, 87 S.Ct. 1657.
 
 
 111
 The rule that administrative remedies may be by-passed only when inadequate to protect strong private interests from irreparable harm
 
 
 112
 'is not one of mere convenience or ready application. Where the intent of Congress is clear to require administrative determination, either to the exclusion of judicial action, or in advance of it, a strong showing is required, both of inadequacy of the prescribed procedure and of impending harm, to permit short-circuiting the administrative process. Congress' commands for judicial restraint in this respect are not lightly to be disregarded.' Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 773-774, 67 S.Ct. 1493, 1503.
 
 
 113
 In Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 51, 58 S.Ct. 459, 463, 82 L.Ed. 638, Justice Brandeis, speaking for the Court, observed that
 
 
 114
 'the rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage.'
 
 
 115
 I do not demean plaintiff's possible losses when noting that the temporary suspension has affected business profits, not the very existence of the commodities plaintiff seeks to sell. In any case, where, as here, public health and safety demand emergency removal of a commodity from the market, even unrecoverable financial losses incurred pendente lite must be deemed an expense of the litigation itself. Cf. Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088; Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999.[1]
 
 
 116
 From these considerations, it is apparent that the district court improperly assumed jurisdiction to grant relief in this case. Congress balanced the public and private interests in fashioning not only the Secretary's discretionary power to suspend registration but also the administrative procedures to follow exercise of that power. Congress was not bound to supply the optimal protection to registrants affected by emergency suspensions. It created an adequate system of administrative and ultimate judicial remedies which the district court simply ignored. As the Court concluded in Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 601-602, 70 S.Ct. 870, 873:
 
 
 117
 'The purpose of the * * * provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of (suspensions), and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by (suspension). * * * What we do today determines the jurisdiction of the District Court in all cases in that category. If the court in the present case can halt all (suspension) but one, so can the court in other cases. The means which Congress provided to protect consumers against the injurious consequences of protracted proceedings would then be seriously impaired. Congress weighed the potential injury to the public from misbranded articles against the injury to the purveyor of the article from a temporary interference with its distribution and decided in favor of the speedy, preventive device of (suspension). We would impair or destroy the effectiveness of that device if we sanctioned the interference which a grant of jurisdiction to the District Court would entail.'
 
 
 118
 I would reverse and dismiss this complaint.
 
 
 
 [1]
 The language of these and other cases strongly suggest that the administrative exercise of emergency powers is amenable to treatment as necessarily 'committed to agency discretion' and therefore within the exception of Section 10 of the APA and not subject to judicial review. See 5 U.S.C. 701(a)(2)
 In Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1093, 1099 (D.C.Cir.1970), the Secretary had refused to exercise his discretionary powers and the court of appeals awarded relief in the nature of mandamus. But administrative refusals to exercise discretionary powers have frequently been treated as within the aforesaid exception, rather than looked upon as involving issues of 'finality' and 'exhaustion,' because the refusal to act in fact represents agency disposition of a matter. See generally, Saferstein, Non-reviewability: A Functional Analysis of 'Committed to Agency Discretion,' 82 Harv.L.Rev. 367 (1968). In any event, whether the refusal of the Secretary of Agriculture to exercise his emergency powers constitutes a final, reviewable order does not indicate that the actual exercise of the power should be similarly treated by courts when asked to intervene on behalf of disgruntled registrants. Certainly the practical considerations pressing for or against judicial action differ greatly depending upon the kind of decision rendered by the Secretary.