**STEARNS ELECTRIC PASTE COM-
PANY, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION
AGENCY, Respondent.**

No. 71–1112.

United States Court of Appeals,
Seventh Circuit.

May 11, 1972.

Argued Dec. 10, 1971.

Decided May 11, 1972.

Esther O. Kegan, Michael G. Berkman, of Kegan, Kegan & Berkman, Chicago, Ill., for petitioner.

Charles Blaine Fielding, Office of the General Counsel, U. S. Environmental Protection Agency, Alan S. Rosenthal, Robert E. Kopp, Department of Justice, L. Patrick Gray, III, Asst. Atty. Gen., Michael C. Farrar, Asst. Gen. Counsel, Washington, D. C., for respondent.

Before KILEY, FAIRCHILD and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

The labeling of economic poisons is regulated by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).[1] All such poisons distributed in interstate commerce must be registered with the Administrator of the Environmental Protection Agency.[2] The Administrator is authorized by FIFRA to refuse, or to cancel, the registration of any poison that is misbranded.[3]

Since 1878 petitioner has been selling phosphorous paste for home use as a rat and roach poison. Its English and Spanish language labels, as modified from time to time, have been registered since shortly after the registration requirement became effective in 1947. On January 4, 1971, the Administrator cancelled these registrations on the ground that phosphorous paste is too poisonous for use in the home except by commercial pest control operators.

The cancellations were precipitated by a review of petitioner's labels, but it is fair to state that the contents of the labels were irrelevant to the determination that the product was too dangerous to be permitted in the home. The evidence plainly showed that phosphorous paste is extremely toxic, that it possesses "great potential for harm," as the Hearing Examiner found, and that both adults and children have been killed or hospitalized by misuse of the product. On the other hand, there is no finding, and little or no evidence, of mortality or morbidity resulting from the use of the product in compliance with the directions on the

---

1. 61 Stat. 163, 7 U.S.C. §§ 135–135k.

2. 7 U.S.C. § 135b. The administration of FIFRA, which was initially entrusted to the Secretary of Agriculture, is now committed to the Administrator of the Environmental Protection Agency by virtue of Reorganization Plan No. 3 of 1970, 35 Fed.Reg. 15623, 84 Stat. 2086, 5 U.S.C. App., p. 609 (1970 ed.) (effective December 2, 1970).

3. 7 U.S.C. § 135b(c). The statute authorizes the Administrator to refuse registration if it does not appear "that the article is such as to warrant the proposed claims for it or if the article and its labeling and other material required to be submitted do not comply with the [Act]. . . ."

7 U.S.C. § 135(z) (2) provides that any economic poison shall be considered misbranded:

"(c) if the labeling accompanying it does not contain directions for use which are necessary and if complied with adequate for the protection of the public;

(d) if the label does not contain a warning or caution statement which may be necessary and if complied with adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals;

  \*     \*     \*     \*     \*

(g) if in the case of an insecticide, nematocide, fungicide, or herbicide when used as directed or in accordance with commonly recognized practice it shall be injurious to living man or other vertebrate animals, or vegetation, except weeds, to which it is applied, or to the person applying such economic poison;"

The Administrator may suspend the registration during a cancellation proceeding if he finds that the insecticide presents an "imminent hazard" to the public. 7 U.S.C. § 135b(c).

label.[4] The theory of the cancellation order was succinctly explained by the Government's principal witness who testified "that the general public is incapable of handling these things and following directions." [5]

Petitioner's challenge to the cancellations raises both procedural and substantive questions of first impression.[6] At the heart of the controversy is the question whether FIFRA includes a "substantive standard of product safety [7]," and if so, what that standard is. Because of the novelty and importance of the issues, we shall state the facts in some detail, then review the statute, and finally test the findings against it.

## I.

Stearns Electric Brand Paste is an inexpensive and effective killer of rodents, roaches, water bugs and similar pests. The active ingredient in Stearns Paste is white phosphorus, a highly toxic substance, for which—as is true of most poisons—there is no known antidote.[8] Phosphorous paste is the only kind of poison which is sold as both a rodenticide and roach killer. It is also the only product sold by petitioner. If an adult swallows over half. a tube, "the odds are" that the ingestion will be fatal. Ingestion of much smaller quantities may prove fatal to children. The record plainly supports the finding that the product possesses "great potential for harm." (A. 269, Judicial Officer's decision.)

Petitioner markets its product through distributors and by direct mail. About 300,000 tubes are sold annually at a retail price of about 69 cents per tube. Since each tube contains enough paste

4. The Judicial Officer's conclusions, adopting the recommendations of the Hearing Examiner, contained the following somewhat ambiguous statement:
"The record herein and the record before the then Director, Pesticides Regulation Division, prior to the promulgation of Interpretation 26, demonstrate numerous instances of morbidity or injury especially to children and fatalities resulting from the accidental ingestion of phosphorus paste insecticide and rodenticide when utilized as directed and when misused based on what appears to be the best data available although such data is limited in scope and is often lacking in detailed information." A.271. However, as noted in the text, there is no specific finding of injury from Stearns Paste when used as directed. Certainly, it *is impossible from the evidence or the findings to appraise the extent of such injury.*

5. "Q So I want to get it perfectly clear that as far as Dade County, which has among the better recordkeeping offices in the country, there is no evidence of any death in the proper use of Stearns Paste in accordance with the label direction?
"A That's correct. I have no argument with that, and my only comment—I am not saying it to be argumentative—but just amplifying my philosophy on the use of poisons by the general public, my only comment is that the general public is incapable of handling these things and following directions.

"I mean, we are dealing here with a class of people for the most part who cannot read or write. We now have a major segment of our society down there who are Spanish-speaking, and read Spanish. I don't know if the labels—in fact, I have seen no evidence of Spanish labels on many of our pesticides and hazardous products that are made available to the public.
"It is my considered opinion that the public has the potential, and it is a real potential, of abusing and misusing a product, and therefore, we have to consider when we release products to the public this real potential.
"It is always there, and this is one of the major factors that we have to consider in reference to certifying anything that is made available to the public." Tr. 316–317. Excerpt from testimony of Dr. Joseph Davis.

6. Respondent has advised us that the order under review in this litigation was the first final cancellation order issued by the Administrator after completion of the administrative procedures set forth in the statute.

7. See Enviromental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1095, n. 2 (1970).

8. See testimony of Dr. Davis: "There are very few poisons for which there is a real antidote." Tr. 288.

for about 50 baits, it is estimated that 72 million baits of Stearns Paste have been used in the past five years. The Company receives about 1500 letters a year from customers who have moved and cannot find a local source of the product; many of these letters state that Stearns Paste is the best rat or roach killer the writer has used. The effectiveness of the product is not disputed; indeed, the question is whether it is too poisonous to be permitted in homes.

The tube is plainly labeled in black and red print as "POISON," with the skull and crossbones symbol and instructions for use printed in black and red letters. The tube is sold in a paper carton, which also contains an explanatory insert. The insert and carton, like the tube, prominently display the poison warnings.[9]

The record indicates that other products which will kill rats, and other products which will kill roaches, are available. Petitioner's evidence tended to show that the alternatives were less effective and more expensive. The evidence also indicated that rats and roaches pose a significant health problem, particularly in low income areas. Apparently the services of a commercial pest control operator cost at least $35 per visit. The findings do not specifically consider the magnitude of the danger from rats or roaches. Although the findings recognize the availability of various other rodenticides and pesticides, the record contains no square finding that any other product is *as effective* as phosphorous paste,[10] or, as-

---

9. The directions on the tube and carton warn the reader (in red ink) not to "leave Paste in reach of irresponsible persons, children, pets, or domestic animals. Keep Paste away from foodstuffs. Do not apply heat. Wrap used tube well in paper and discard in trash can." Under the label "ANTIDOTE," instructions on how to induce vomiting are followed by advice to "CALL A PHYSICIAN IMMEDIATELY." The instructions for use then follow.

To kill rats and mice, the user is told to "apply Stearns' Electric Brand Paste on bread, cheese, or other food they will eat, leaving it in places where rats run and feed and out of reach of children, pets, or domestic animals. Tamper-proof bait boxes or other suitable protective covers are recommended. Repeat every night until rodents have disappeared."

To kill cockroaches, water bugs and croton bugs, the instructions are to apply the paste "on pieces of paper and place in and about sinks, water pipes, stationary wash basins, etc. In morning carefully burn these pieces of paper and dead bugs, or wrap well in paper and discard in trash can. Repeat every night until rid of these pests."

10. The government argues (Br. p. 16) that "[t]he testimony of several witnesses also bears out [the Judicial Officer's] findings concerning the ready availability of a number of alternative, safer, and effective products and, therefore, establishes the absence of any significant benefit from the use of phosphorus paste [transcript cites]."

The cited references are hardly persuasive. Two experts in toxicology and two physicians who are experts in pathology testified. They spoke on the basis of "impressions" of community usage or "information from my staff." No details whatever were given as to the comparative effectiveness of the alternatives in rodent and roach control in the lower socio-economic areas or of comparative cost or difficulty of administration. Dr. Harris, a chemist, testified other products were available, but he gave no specific information on their effectiveness or availability (Tr. 91–94). Mr. Alford testified only that his staff had assured him other products were available. He named them, indicated proceedings were already under way to ban home use of some, and gave no information on comparative effectiveness and economic availability (Tr. 202–204). Dr. Davis, a pathologist, testified as to his "impression" of community usage and about what a commercial pest control operator told a Miami ordinance-drafting committee. He indicated Warfarin was an alternative but did not discuss its comparative effectiveness (other information in the record indicates that the effectiveness of this product depends on the cumulative effect of several ingestions, whereas one ingestion of Stearns' product would kill the rodent). Dr. Davis testified that he used Baygon insecticide in his home and that it was effective. He also said the government had hired commercial pest con-

suming that cost is relevant, that any other product performing the same function is *equally* available.[11]

As a result of an interagency agreement negotiated in 1964,[12] the Department of Agriculture began to refer economic poison labels to the Food and Drug Administration for toxicological review. In making such review, the FDA applied a "general policy that a product that can produce serious injury or death in a small child from an average swallow of about 4½ to 5 cubic centimeters should not be used around the home particularly if there are safer equally effective alternate materials." [13]

On March 8, 1968, in response to a request from Agriculture for a comment on a proposed label revision, FDA objected to the reregistration of petitioner's product pursuant to its general policy against the home use of products that can produce serious injury or death in a small child from an average swallow. Petitioner was then advised by respondent [14] that it would reevaluate its "registration policy with respect to

products containing phosphorus paste for use in the home."

On October 7, 1968, respondent issued a notice of proposed interpretation "with respect to labeling of phosphorus paste products," and invited comments thereon.[15] The interpretation stated that home use would be unacceptable, but use by government agencies and professional pest control operators would be permitted. Petitioner filed written comments and suggestions which were duly considered and rejected, and on March 19, 1969, Interpretation No. 26 was issued effective 60 days after publication in the Federal Register.[16]

On May 23, 1969, respondent issued notices of cancellation of both of petitioner's registrations.[17] Petitioner filed timely objections and on October 6 and 7, 1970, an evidentiary hearing was held. The Hearing Examiner ruled that the burden of proof was on petitioner, who thereafter presented one witness and 21 exhibits. Respondent's case included the testimony of 8 witnesses and 9 exhibits. After considering the record and argu-

trol operators to use it in Model Cities Program areas, but admitted no expert knowledge of the effective use of alternative products in areas not receiving this government aid (Tr. 348, 364–365, 387–389, 394–396). Dr. Fisher, a pathologist, testified "more from personal experience than as an expert" that Warfarin was a safer rodenticide. He too had no information as to its comparative effectiveness (Tr. 433–436). Thus, there was no direct evidence from any expert in pest control as to the comparative effectiveness and availability of alternatives to Stearns' product.

11. A rodenticide which is effective but so highly priced that it is unlikely to be economically available to the people who need it most would not be a practical alternative to registrant's product. Yet, the Assistant Director of the Pesticide Regulation Division of the Department of Agriculture testified that "we don't consider economics in determining whether or not registration is warranted." (Tr. 258).

12. Memorandum of agreement between the Secretaries of Agriculture, Interior and Health, Education and Welfare, 29 Fed. Reg. 5808.

13. Judicial Officer's Finding No. 5, A.258. In February of 1966, petitioner was advised that it would be necessary to make certain changes in its directions for use in view "of the increased emphasis on safe practices in the home environment." Various changes, such as reducing the amount of phosphorus in the paste and the use of scraps of paper instead of bits of food as bait, were thereafter discussed in protracted correspondence between the parties.

14. We use the term "respondent" to refer to representatives of the Department of Agriculture prior to December 2, 1970, and to the Environmental Protection Agency thereafter.

15. 33 Fed.Reg. 15214 (Oct. 11, 1968).

16. 34 Fed.Reg. 5537 (March 22, 1969).

17 "Notices of cancellation were sent to all registrants of the type of product involved herein, numbering 12 or 14 registrants, including Stearns Electric Paste Company, and covering 19 or 20 products. Only one objection to cancellation in addition to Stearns' was filed which objection was subsequently withdrawn." A. 261.

ments of counsel, the Hearing Examiner filed a recommended decision including proposed findings of fact and conclusions. His recommendations were adopted by a judicial officer of the Department of Agriculture, who entered the order of cancellation on January 4, 1971. We stayed the operation of the order pending review in this court.

Respondent's evidence consisted primarily of expert opinion as to the toxicity of phosphorous paste and such data as was available concerning the harm which it has actually caused humans. The statistical evidence included data from the National Clearinghouse for Poison Control Centers [18] and reports from state agencies.

The witness from the National Clearinghouse estimated that there are approximately one million ingestions of harmful substances each year, of which only about 115,000 are reported to a poison control center. The reported ingestions include a wide variety of substances, such as aspirin, kerosene, detergents, and other household products, as well as economic poisons. When measured strictly by the number of reported fatalities, aspirin is the most lethal substance used in the home environment.[19] The National Clearinghouse records placed in evidence in Government Exhibit IV cover the period from January 7, 1962, through August, 1968. Those records describe 207 ingestions of phosphorous paste products, of which 147

were accidental, 51 were suicidal, and 9 were not classified as either accidental or suicidal. A total of 15 deaths resulted, 9 in the suicidal category, 5 in the accidental, and 1 that was unclassified. Forty of the accidental ingestions, 38 of which involved children, required hospitalization. The 5 accidental deaths all involved children.[20]

Stearns Paste accounted for a substantial portion of the total during the 6½ year period. Of the 5 accidental deaths, 3 were attributed to Stearns Paste; of the 51 suicidal ingestions, 20 were Stearns; of the total 207 ingestions, 86 were Stearns.[21]

Since only about 10% of all ingestions of harmful substances are reported to a poison control center, it is reasonable to infer that there may have been a significantly larger number of ingestions of phosphorous paste than is revealed by the record. Since there is presumably a greater likelihood that a poisoning which resulted in death or hospitalization would be reported (at least if correctly diagnosed), it is not clear whether the same inference may be drawn with respect to unreported fatalities. The National Clearinghouse records do establish, however, that at least three children were killed by petitioner's product in the 1962–68 period. Data collected from state agencies for the years 1952 through 1968 indicate that phosphorous paste was responsible for 40 deaths.[22]

18. The formal title of the clearinghouse is "Poison Control Division, Office of Product Safety, Food and Drug Administration."

19. Petitioner's Exhibit 9 is the tabulation of poison reports for 1968 and 1969. In 1968 there were 15,523 cases involving ingestion of aspirin by children under 5 years of age, and over 2,500 cases involving persons over 5 years of age. There were 11 fatalities from aspirin ingestions in 1968. In 1969 there were 14,494 ingestions of aspirin by children under 5 and about 3,000 cases involving older persons. There were 15 aspirin fatalities in 1969. The aspirin fatalities far exceeded those for any other single item. Other figures for 1968 and 1969, respectively,

were: Medicine combinations, 32, 27; barbiturate sedatives, 15, 17; psychopharmacologic agents, 11, 16; insecticides of all types, 11, 14.

20. A. 262, Judicial Officer's decision.

21. Id. at 262–263.

22. The record includes responses by 42 state agencies to an inquiry from respondent for information about accidents or incidents involving phosphorous paste products for the years 1952 through 1968. In 13 states there were no reported cases; in 15 states no records of mortality or morbidity from phosphorous paste ingestions were maintained; one state had not completed the search of its records. The

The evidence describing how most of the ingestions actually occurred is sparse. However, the Medical Examiner of Dade County, Florida, and the State Medical Examiner for Maryland have kept better records than most agencies; they provided the examples which respondent stressed in its presentation to the Hearing Examiner.

Dr. Davis, from Dade County, expressed the firm opinion that phosphorous paste is too toxic to be permitted in the home. He was a sponsor of an ordinance in the City of Miami which outlawed the use of the product in that jurisdiction.[23] His data reflects 13 deaths in Dade County in the years 1956 through 1968, of which 10 were probably suicides. The three accidents all involved children. In 1956 a 10-year old boy apparently ingested some paste applied in an apartment building by a professional exterminator; in 1958 a young child found a poison bait in a neighbor's garbage container and swallowed it; in 1960 a 3-year old apparently obtained access to a tube of paste in a home and swallowed part of its contents.

The Maryland records describe 22 deaths in the years 1950 through 1966, of which 15 were suicides, 5 were accidental ingestions by adults (apparently intoxicated), and 2 by children. In 1954 a 4-year old girl found an open can of paste which had apparently been left in an apartment by a former tenant; in 1961, 3 children shared some baits found in or near a garbage can in a neighbor's yard separated from the children's own yard by a four-foot wire fence. One died and two were hospitalized. The Maryland doctor was not asked to produce records indicating the relative importance of phosphorous paste as a cause of death in the home environment, but

commented that aspirin is the most common cause of poisoning in children. He estimated that aspirin or other medicinal poisonings killed 2 or 3 children each year in Maryland, which he characterized as a "low incidence."

The record discloses that at least some of the deaths caused by phosphorous paste products followed application by commercial pest control operators; it does not disclose how many children were killed by rats or roaches, or how many were saved from harm by the use of petitioner's product.

After finding that petitioner's product had actually caused significant mortality and morbidity, and that it presented a great potential for harm, the Judicial Officer concluded, in conformity with the Hearing Examiner's recommendations: (1) that petitioner had the burden of proving that the registrations should not be cancelled; (2) that the use of phosphorous paste insecticides and rodenticides in and around the home could not be rendered safe by any label;[24] (3) that petitioner's warning statement, even if complied with, is inadequate to prevent injury to living man;[25] and (4) that the product is "misbranded" because when used "in accordance with commonly recognized practice" it is "injurious to living man";[26] and (5) that he had taken in consideration the fact that effective and less toxic insecticides and rodenticides are available on the market.

Petitioner contends (1) that there were procedural defects in the administrative proceedings; and (2) that Stearns Paste was not "misbranded" within the meaning of the statute. Before discussing these contentions, we shall review the history of FIFRA.

---

13 remaining states reported a total of 72 accidental ingestions of which 40 were fatal. Many of the ingestions involved children. Id. at 263–264.

23. The text of the Miami ordinance is not in the record.

24. In violation of 7 U.S.C. § 135(z) (2) (c).

25. In violation of 7 U.S.C. § 135(z) (2) (d).

26. In violation of 7 U.S.C. § 135(z) (2) (g).

## II.

The Insecticide Act of 1910 prohibited the interstate sale of any insecticide or fungicide which was adulterated or misbranded within the meaning of the statute. 36 Stat. 331. The text of the Act makes it plain that Congress was primarily concerned with the effectiveness of such products and protecting purchasers from deceptive labeling. The Act contained criminal sanctions and provisions for seizure of misbranded or adulterated items, but neither a registration requirement nor a safety oriented labeling requirement.

FIFRA, which repealed the 1910 statute, was enacted in 1947. Like its predecessor, its text indicates a primary interest in protecting consumers from the purchase of ineffective products. However, the coverage of the statute was substantially broadened,[27] a purpose to protect the public from the hazards associated with the use of economic poisons was implemented,[28] and, for the first time, all economic poisons were required to be registered with the Secretary of Agriculture. The registration requirement was included as an aid to enforcement.[29] If the Secretary disap-

27. "This bill embraces, in addition to insecticides and fungicides, rodenticides, herbicides, devices and preparations intended to control other forms of pests which are not subject to the present Insecticide Act of 1910. Rodenticides are being marketed in large quantities and many of them are weak and ineffective and have tended to imperil various rodent-control programs. The importance of rodenticides can readily be appreciated when it is realized that the estimated damage by rats alone has amounted to some $200,000,000 annually." H.Rep. 313 (80th Cong., 1st Sess.), 1947 U.S. Code Cong.Serv. pp. 1200, 1201.

28. "Other important improvements and changes over the present law which would be provided by this bill are as follows:
(1) A provision requiring the registration of economic poisons prior to their sale or introduction into interstate or foreign commerce.
(2) The inclusion of provisions for protection of the public against poisoning by requiring prominently displayed poison warnings on the labels of highly toxic economic poisons.
(3) A provision requiring the coloring or discoloring of dangerous white powdered economic poisons to prevent their being mistaken for flour, sugar, salt, baking powder or other similar articles commonly used in the preparation of foodstuffs.
(4) A requirement that warning or caution statements be contained on the label of the economic poison to prevent injury to living man, other vertebrate animals, vegetation, and useful invertebrate animals.
(5) A provision requiring instructions for use to provide adequate protection for the public.

(6) A provision declaring economic poisons to be misbranded if they are injurious to man, vertebrate animals, or vegetation, except weeds, when properly used.
(7) A provision requiring information to be furnished with respect to the delivery, movement, or holding of economic poisons and devices." Ibid.

29. "One of the principal provisions of the bill is the one providing for the registration of economic poisons prior to their being marketed. It is believed that this provision will provide additional protection for the public, assist manufacturers in complying with the provisions of the bill, and at the same time hold administrative costs to a minimum. Under the existing law, the Administrator has no means of ascertaining or knowing what economic poisons are being marketed, except by having a force of inspectors circulating through the country picking up samples here and there, wherever they may be found. Frequently, serious damage is suffered by agricultural producers and other users of economic poisons through the use of misbranded or adulterated economic poisons before the enforcement officials have any knowledge of the existence of such articles, or of their being offered to the public. Under this bill, any economic poison subject to the provisions thereof will be brought to the attention of the enforcement officials who will have an opportunity to become familiar with the formula, label, and claims made with respect to any such economic poison before it is offered to the public. It should be possible, therefore, in a great majority of instances, to prevent false and misleading claims, and to prevent worthless articles from being marketed, and to provide a means of obtain-

proved of the applicant's proposed labeling, the applicant nevertheless had an absolute right to have his product registered under protest. Thereafter, unless the Secretary could prove in a judicial proceeding that the product was either misbranded or adulterated, he had no authority to exclude it from commerce.[30]

In 1964 the statute was amended to give the Secretary the power to refuse to register a new product, or to cancel an existing registration, if he found that the product was either adulterated or misbranded. The House Report on the 1964 changes and what little floor discussion there was indicate quite clearly that the only major change[31] contemplated was elimination of the registration under protest procedure. The change was made for two basic reasons: (1) to settle the question of compliance with the act before the economic poison could be marketed and (2) to place the burden of proof of safety and effectiveness on the applicant for registration.[32] The concern remained with efficacy and safety "when used as directed."[33] No

ing speedy remedial action if any such articles are marketed. Thus, a great measure of protection can be accorded directly through the prevention of injury, rather than having to resort solely to the imposition of sanctions for violations after damage or injury has been done. Registration will also afford manufacturers an opportunity to eliminate many objectionable features from their labels prior to placing an economic poison on the market." Id. at pp. 1201–1202.

30. There is little legislative history on the 1947 Act. The Senate Report merely reprinted the short House Report (6 pages in U.S.Code Cong.Serv.) and the floor consideration in both houses was perfunctory. The legislative history thus sheds no more light on the meaning of the crucial sections, 7 U.S.C. § 135(z) (2) (c), (d) and (g), than the words of the statute itself. There were some changes made in the Act in 1959, but those changes are not relevant for our purposes.

31. Only one other change of any significance was made. The 1947 Act prohibited any reference on the label to registration under the Act. The 1964 amendments permitted a registrant to put his registration number on the label and required that it be on the label if the Secretary so directed.

32. The House Report pointed out that the protest registration procedure in effect prior to the 1964 amendment placed the burden of proof on the Government and that the bill was intended to "correct this situation." The Report stated, in part:

"The principal effect of registration under protest is to shift the burden of proof from the registrant to the Government. If the product is not registered, the penalty or seizure provisions can be applied on that ground. If it is registered under protest, the Government has the burden of proving that the product does not comply with the act.

Thus, at present, the Secretary can be required to register a product even though he is convinced that it is ineffective and dangerous to human life. He can proceed against it in such case only after it has moved in interstate commerce, and he then has the burden of proving that it violates the law. The bill would correct this situation and afford greater protection to the public by repealing the authority for registration under protest. In its place the bill provides that applicants dissatisfied with the Secretary's action in refusing or canceling registration may have recourse to advisory committee proceedings, public hearings, and eventually judicial review. . . . " H. Rep. 1125 (88th Cong.2d Sess.), 1964 U.S.Code Cong. & Admin.News, pp. 2166, 2167.

33. "According to the Director of the Pesticides Regulation Division of the Department of Agriculture, the 1947 act—known as the Federal Insecticide, Fungicide, and Rodenticide Act—is 'basically a labeling law which protects the public by requiring that the label be adequate to protect the public, *when followed.*' The key protective feature of the law—as pointed out frequently by Department of Agriculture officials over the years—was that all pesticides were required to be registered with the Secretary of Agriculture before they could be sold in interstate commerce. Registration, we have been told, meant that the product was effective and safe *when used as directed.*

\*       \*       \*       \*       \*

"In addition, the legislation requires that every pesticide formulation carry its official registration number on the label. In this way the public will be able to tell at a glance that the product on the shelf has satisfied the requirements of

changes were made in the language of 7 U.S.C. § 135(z) (2) (c), (d) and (g). the provisions with which we are primarily concerned.

### III.

As a matter of procedure, petitioner contends that Interpretation 26 is invalid because it was promulgated without a prior public hearing, and that it was error to require a registrant to assume the burden of proving that the proposed cancellations were improper.[34]

■ We agree with respondent's characterization of Interpretation 26 as a mere announcement of the agency's position which did not have the legal effect of a regulation. It is true, as petitioner argues, that the policy expressed in the Interpretation led to the issuance of the cancellation notices, but the Interpretation was not self-executing. Although not required by the Administrative Procedure Act,[35] we think the agency acted properly in soliciting comments on its proposed policy statement before issuing Interpretation 26, and that it was appropriate to give an industrywide notice of its proposed position even though the Interpretation had no immediate legal effect.[36] We are satisfied that the availability of an evidentiary hearing before a cancellation order is effective, together with the safeguard of appellate review, adequately protects a registrant's procedural rights.

■ We also reject petitioner's contention that respondent, as the proponent of the cancellation order, should have assumed the burden of proof. The 1964 amendment to FIFRA was clearly and specifically intended to shift the burden of proof from the Secretary (now the Administrator) to the registrant.[37] It is true that most of the

Federal law as to its *effectiveness and safety when used according to the directions on the label.*" 109 Cong.Rec. 20080 (1963) (remarks of Sen. Ribicoff on 1964 changes to FIFRA) (emphasis added).

"Provision is also made that registration of any economic poison may be refused if, in the opinion of the Director, directions, or warnings cannot be written which would *when followed* prevent injury to the general public." 109 Cong. Rec. 16446 (1963) (preface to revision of FIFRA regulations inserted by Sen. Ribicoff into the Congressional Record) (emphasis added).

34. Rule 364.28 entitled "Order of Proceeding and Burden of Proof" provides:
"At the hearing, the person whose objections raised the issues to be determined shall be, within the meaning of 5 U.S.C. 556(d) (formerly 5 U.S.C. 1006(c)), the proponent of the order sought, and accordingly shall proceed first at the hearing and have the burden of proof."

35. 5 U.S.C. § 553(b) provides:
"Except when notice or hearing is required by statute, this subsection does not apply—
"(A) to interpretive rules, general statements of policy, . . . ;"
Furthermore, even if 5 U.S.C. § 553 did apply, § 553(c) does not require a hearing but only "an opportunity to participate . . . through submission of

written data, views, or arguments." That opportunity was afforded registrant here. We note that the section authorizes, but does not require, an opportunity for oral presentation.

36. Respondent concedes that it could not, at the cancellation hearing, merely rely on Interpretation 26 and that petitioner was entitled to a hearing de novo.

37. See quotation from committee report, *supra,* note 32. See also 110 Cong.Rec. 2948–2949 (remarks by Rep. Sullivan):
"This bill places the burden of proof on industry, to establish that a pesticide can safely be marketed before a certificate of registration can be issued."
Other comments which the congresswoman made earlier and inserted in the record after the preceding remark further indicate the change in burden which was intended.
"I am strongly in favor of the legislation now before you to require industry, rather than the Federal Government, to shoulder the burden of proof in connection with the marketing of pesticides which may be unsafe for use as intended.
\*    \*    \*    \*    \*
"The burden of proof of safety should always be on the manufacturer. . . . We must close any loopholes in the law which permit manufacturers to market products they cannot prove are safe in use in the manner intended. The bur-

legislative comment concerned new registration rather than cancellation of existing registrations, but we do not believe the statute was intended to differentiate between the two situations.[38] In view of the agency's continuing obligation to review the propriety of existing registrations, we are also satisfied that the purpose of the 1964 amendment is applicable to cancellation proceedings. The Examiner properly held that Stearns should assume the burden of proving that its registrations complied with the statute.[39]

We must therefore decide whether petitioner proved a *prima facie* case and, if so, whether the right to continue the registration was overcome by respondent's evidence. These issues require identification of the statutory standards for registration.

### IV.

To be eligible for the registration under FIFRA, the product must be "an economic poison."[40] The statute has no application to products which are completely safe, or to products like aspirin

---

den of proof should not rest on the Government, because great damage can be done during the period the Government is developing the data necessary to remove a product which should not be marketed."

38. Actually, there are three separate points in the registration process at which the burden of proof question could arise: (1) the initial registration, (2) cancellation or refusal to reregister at the end of the initial or a subsequent 5-year registration period, and (3) cancellation during the term of a registration. Even petitioner concedes that the burden at the time of initial registration is upon the registrant—given the legislative history it could hardly be argued otherwise. See notes 32 and 37, *supra*. The statute, 7 U.S.C. § 135b(f), provides for the cancellation in situation (2) above "unless the registrant . . . requests . . . that such registration be continued in effect." The fact that the statute requires the registrant to request reregistration clearly implies that the burden in situation (2) is the same as in (1). If a presumption of proper use at the' end of a 5-year period does not shift the burden of proof in situation (2), we think there is even less reason to shift the burden in the middle of a 5-year term if the Administrator should then become aware of previously unknown risks associated with the use of a product. Since we see no reason why the location of the burden of proof should depend on the timing of the Administrator's first awareness of a compliance problem, we are satisfied that the problem in situation (3) is comparable to (1) and (2).

39. Petitioner argues that in a cancellation rather than registration proceeding, the Administrator is the proponent of the order sought for purposes of 5 U.S.C. § 556(d) and that the regulation, *supra*,

note 34, naming the registrant as the "proponent" is therefore invalid. Section 556(d) provides:

"Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof."

Even if the Administrator is the "proponent" of a cancellation order, the location of this burden is "otherwise provided by statute." Specifically, we read FIFRA itself as requiring that the burden of proof be on the registrant whether in a proceeding for initial registration or in a cancellation proceeding. The statutory language of 7 U.S.C. § 135b(c), taken with the clear intent to shift the pre-1964 burden of proof, cannot properly be read as providing for any distinction between registration and cancellation. The advisory committee, hearing and review provisions apply to both situations, and the concern with safety when used as directed expressed by Congress cannot be reconciled with a theory which would place the burden of proof on the government. Whether the Administrator discovers the hazard at the time of registration or later, Congress intended that the registrant have the burden of proving compliance with the provisions of the statute. *Accord*, Environmental Defense Fund, Inc. v. Ruckleshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 593 (1971).

40. "The term 'economic poison' means (1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any insects, rodents, nematodes, fungi, weeds, and other forms of plant or animal life or viruses, except viruses on or in living man or other animals, which the Secretary shall declare to be a pest, and (2) any substance or mixture of substances intended for use as a plant regulator, defoliant or desiccant." 7 U.S.C. § 135(a).

and detergents which are safe enough in normal use but endanger children when used negligently. Thus, the first element of a registrant's *prima facie* case is proof that his product is dangerous; by hypothesis a poison is not completely safe.

The poison may not be registered if it is either "adulterated" or "misbranded." These terms embody more than one standard.

First, the product must be effective; more precisely, it must be at least as effective as the registrant claims it to be. Since all economic poisons are intended to kill some form of plant or animal life, in a sense the statute includes a minimum standard of deadliness. Petitioner's uncontradicted evidence of the effectiveness of its product met that standard.

Second, the product must satisfy certain safety standards. Although the definition of the term "adulterated" in other legislation embodies safety considerations,[41] in FIFRA it is the definition of the term "misbranded" that identifies the statutory standards of product safety. There are slight variations in the language used in different subsections of the Act, but two principal standards are identified: (1) the label accompanying the product must contain directions for use and a warning or caution statement which *"if complied with* [is] adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals";[42] and (2) an insecticide, nematocide, fungicide, or herbicide (but not a rodenticide), is misbranded if "when used as directed or *in accordance with commonly recognized practice* it shall be injurious to living man or other vertebrate animals, or vegetation, except weeds to which it is applied, or to the person applying such economic poison."[43] The italicized phrases are those most relevant to the issues in this case.

The first of these standards focuses on the safety of the product when used in compliance with directions. We think petitioner's evidence of a long history of use of Stearns Paste, involving broad distribution and numerous repeat orders, coupled with the absence of claims or evidence that injury had actually resulted from use of the product in compliance with directions, was sufficient to make a *prima facie* showing of satisfaction of this statutory standard.

The second standard relates to the use of Stearns Paste as a roach and water bug killer. For this use, the directions specify pieces of paper, rather than scraps of food, as bait. It was therefore less hazardous than when used as a rodenticide. Moreover, from petitioner's evidence it would be reasonable to infer that the "commonly recognized practice" in applying Stearns Paste was consistent with the directions on the label. Accordingly, we believe petitioner also made a *prima facie* showing of compliance with this standard.

Petitioner's *prima facie* case was, of course, subject to being overcome by respondent's evidence of misbranding. Whether it has been overcome in this case depends largely on a proper formulation of the standard for finding a violation of FIFRA. Respondent, in effect, relies on a substantive standard of product safety which has little, if any, relevance to the contents of the label.[44] Respondent states the test thusly:

"Thus, the final decision with respect to initial or continued registration of

---

41. Compare, for example, the language of § 135(z) (2) of FIFRA with the definitions of adulteration in the Food, Drug and Cosmetic Act, 21 U.S.C. §§ 342 and 351, and the misbranding provisions of the same statute, 21 U.S.C. §§ 343 and 352.

42. 7 U.S.C. § 135(z) (2) (d) (emphasis added). See also § 135(z) (2) (c), *supra*, note 3.

43. 7 U.S.C. § 135(z) (2) (g) (emphasis added).

44. In contrast, consider the following comment by Senator Ribicoff: "The Federal pest control law has been described by those who administer it as being 'basically a labeling law.'" 109 Cong.Rec. 16446 (1963).

a product depends on the intricate balance struck between the benefits and dangers to the public health and welfare resulting from its use. More specifically, the Administrator must determine and weigh (1) the nature and magnitude of the foreseeable hazards associated with use of a particular product against (2) the nature of the benefit conferred by the use of the product, or, put another way, against the magnitude of the social cost of foregoing the use of the product."[45]

Respondent explains that this test finds its source in the opinion of the Court of Appeals for the District of Columbia in Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App. D.C. 74, 439 F.2d 584, 594 (1971), rather than in language employed by Congress.[46] An important distinction between *Ruckelshaus* and this case should be noted. *Ruckelshaus* involved possible cancellation of the registration of DDT, an insecticide which has an impact on the environment even when used in complete conformity with the manufacturer's directions.[47] That product, when properly used, has known benefits and a potential for harm that is not precisely known. To determine whether DDT is "injurious to man" requires, as the District of Columbia Circuit has fairly stated, a delicate balancing of its benefits against its adverse effects.[48] Does the net result constitute injury to man within the meaning of FIFRA? If so, it is

misbranded. In short, we think the standard as stated by respondent gives proper effect to the statutory language if used to measure the net injury resulting from use of an economic poison in compliance with directions.

A different situation is presented when the harm is entirely, or at least primarily, attributable to misuse of the product. To apply respondent's balancing test to such a situation is to ignore completely the concept of misbranding. Although it is consistent with the statutory language and purpose to apply a substantive standard of product safety to the use of a product in compliance with its manufacturer's directions, there is no statutory support for the application of that standard to misuse of a product. Without such support, the formulation of substantive standards of product safety by an administrative agency expands the scope of administrative discretion beyond permissible limits.

There are other objections to respondent's application of the "intricate balance" test to the problem presented by this case. In the DDT situation, the benefits of the poison are ascertainable with a reasonable degree of certainty; it is the other side of the balance that is difficult to weigh accurately. Moreover, the injury from DDT is to "man" in a collective sense—that is, to the total environment in which he lives. The obverse situation is present here. The cost to the community at large of de-

---

45. Respondent's brief, p. 10. Respondent explained in a footnote that the test which it applies is not explicitly set forth in the statute, stating:

"The FIFRA itself does not explicitly provide that, prior to a cancellation or suspension, the Administrator must or should consider the benefits derived from use of a pesticide. It would, however, be unreasonable to ban the interstate distribution of a pesticide on grounds of hazard to public health or the environment if in fact such a ban would itself cause the greater hazards (*e. g.*, the unleashing of disease vectors). In reliance upon the Act's legislative history and recent judicial interpretations, the En-

vironmental Protection Agency has now unequivocally taken the position that Congress has, in the Act, granted the Agency sufficient discretion to weigh the hazards and benefits from use of a pesticide in making a final cancellation determination. . . ."

46. See note 45, *supra*.

47. *Cf.* Environmental Defense Fund, Inc. v. United States Dept. of H.E.W., 138 U. S.App.D.C. 381, 428 F.2d 1083 (1970); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970).

48. 439 F.2d at 594.

priving the homeowner and apartment dweller of an inexpensive rat poison cannot be measured on this record.[49] The injury which respondent seeks to avoid in this proceeding is to specific individuals rather than to the total environment. That harm is largely attributable to willful misuse (in the case of suicide ingestions), wanton recklessness, or at least negligent behavior. Thus, on one side of the balance is a relatively small number of incidents of individual harm resulting from misuse by the comparative few; on the other side is the cost of depriving the prudent majority of a known but only vaguely defined benefit. In short, the conflicting interests are not identified sufficiently in the findings to determine whether the counterbalancing factors have been assigned proper weights.

The "intricate balance" test is inappropriately applied in this case for yet another reason. The Hearing Examiner placed important reliance on the absence of adequate information about the incidence of phosphorous paste poisonings and the actual circumstances in which it occurs without making any attempt to classify the data, either by estimate, by extrapolation, or by specific example, as between ingestions of registered and unregistered products, as between products purchased at retail and paste applied by commercial exterminators, or even as between misuse and use in accordance with instructions. He did endeavor, in discussing the National Clearinghouse data, to identify the portion of total ingestions which involved petitioner's product, and he also identified those examples of deliberate misuse that fell in the suicide category. But his affirmative reliance on the lack of adequate information as possibly supporting an inference that the danger may be ten times as great as the available data actually disclosed, cannot satisfy the test characterized as an "intricate balance." Furthermore, the Judicial Officer's findings contain no analysis of the actual or potential injury to man resulting from rats and roaches.

In any balancing test used to measure the acceptability of public sale of poisonous substances, it is imperative that the emotional impact of dramatic but unfortunate tragedies not be permitted to weigh too heavily on the scales. The spectacle of a young child suffering a violent death by poisoning offers a compelling justification for avoiding the danger of recurrence by banning future use of the poison forthwith.[50] Unfortunately, however, such tragedies are a common occurrence in today's complex society and must be appraised as dispassionately as possible. Whether they justify a particular prohibition involves a policy choice which, under our scheme of government, must be made by a legislature or by an agency to which the legislature has delegated the responsibility for making principled decisions in accordance with its basic statement of pol-

49. The Hearing Examiner made no attempt to define this cost except by noting that other effective rodenticides are available. But he found neither equal effectiveness nor equal availability. Economics was apparently not considered (see note 11, *supra*) even though economics might be a very important consideration in determining equal availability; the two judges of this court who have spoken to the merits of the problem have indicated that some consideration of economics would be appropriate. Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1133, 1135 (opinion of Judge Pell), 1146 (concurring opinion of Chief Judge Swygert) (7th Cir. 1970), reversed on rehearing *en banc* on

procedural grounds, 435 F.2d 1151, 1163 (dissenting opinion of Judge Pell). Moreover, if consideration is given to the possibility that respondent's standards applied on an evenhanded basis might require the banning of other rat poisons as well, there is an even greater uncertainty respecting the cost of the cancellations to the community. Cancellation action has already been initiated or considered against some alternative insecticides (Tr. 204).

50. Equally tragic and dramatic instances might fall on the other side of the balance if every child who has suffered a rat bite could describe his nightmares.

icy. The fact that a legislature may react slowly to obvious dangers, such as the holocaust on our highways,[51] the creeping infection of our environment, and the consumption of deleterious substances in the home, cannot justify an agency's policy determinations that are not authorized by statute.

The danger of misuse is, of course, a proper subject of regulatory concern. But unless the statutory concept of misbranding has itself been misbranded, under FIFRA that danger must be related to the form of the label.[52] Neither the language of the statute nor its legislative history focuses directly on the problem of misuse, but there can be no doubt that the agency was intended to supervise the form and content of labels.[53] An obvious purpose of such supervision is to minimize the risk of misuse.

The Hearing Examiner did note the relevance of the label in certain of his conclusions. Thus, he stated that the label warnings had "not been adequate to prevent injury to living man" since injuries and fatalities had actually been caused by phosphorous paste products.[54] He thus implied that a product might be misbranded whenever its label failed to prevent injury to man. Such a standard of total prevention is manifestly too strict; it would require the agency to prohibit the use of phosphorous paste by commercial pest control operators, and would be broad enough to authorize cancellation of any poison registration whenever an incident involving fatal misuse occurred.[55]

51. "But even the best legislation cannot solve the whole problem. Pesticides would seem to belong in the same category as automobiles—with great potential for good or harm, depending upon how they are used." Galton, Great Debate over Pests and Pesticides, 109 Cong.Rec. 6581, 6583 (1953), reprinted from the New York Times of April 14, 1963.

See also separate opinion of Mr. Justice Blackmun in Perez v. Campbell, 402 U.S. 637, 657, 672, 91 S.Ct. 1704, 29 L.Ed.2d 233. He said at p. 657, 91 S.Ct. at p. 1715:

"The slaughter on the highways of this Nation exceeds the death toll of all our wars. The country is fragmented about the current conflict in Southeast Asia, but I detect little genuine public concern about what takes place in our very midst and on our daily travel routes."

52. As Mr. Justice Frankfurter pointed out:

"In our anxiety to effectuate the congressional purpose of protecting the public, we must take care not to extend the scope of the statute beyond the point where Congress indicated it would stop." 62 Cases More or Less, Each Containing Six Jars of Jam, etc. v. United States, 340 U.S. 593, 600, 71 S.Ct. 515, 520, 95 L.Ed. 645.

53. See notes 33 and 44, *supra*.

54. "Such warning, if complied with, must be adequate to *prevent* injury to living man. The record raises serious doubts whether such warnings can be complied with. Also, that the warnings have not been adequate to prevent injury to living man is apparent from the record of injury and fatality caused by phosphorus paste products, including registrant's." A. 273 (emphasis in original).

Such a strict test was repudiated in the original panel's opinion in Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1133, 1137, reversed on procedural grounds on rehearing *en banc*, 435 F.2d 1151 (7th Cir. 1970). See also the excerpts from *Nor-Am* in note 55, *infra*.

55. Cf. Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1133, reversed on procedural grounds on rehearing *en banc*, 435 F.2d 1151 (7th Cir. 1970). Only two members of the Court reached the substantive issue, and both recognized the difference between harm resulting from proper use and harm resulting from occasional misuse. Chief Judge Swygert wrote in concurring in the original decision:

"The Alamogordo incident was a freak occurrence, the result of the combined negligence of the granary where the seed was treated and the head of the afflicted family. The tragic events came about through misuse rather than normal use of the treated grain. Accordingly, the district court correctly concluded, in my opinion, that the suspension order, based on this single, abnormal incident, was an arbitrary exercise of the Secretary's emergency authority under the statute." *Id.* at 1146.

Judge Pell wrote in dissenting from the *en banc* decision:

"In this country I dare say there are very few barns, medicine chests, or even

We do not believe an isolated incident of misuse causing harm, or even death, to a particular individual is contemplated by the "injury to man" language in the statute. The word "man" is used in a collective sense, or perhaps with a typical connotation, as in the "reasonable and prudent man" concept familiar to negligence lawyers. In that sense the adequacy of the label may be judged by its tendency to protect against misuse. The judgment appropriately takes into account the toxicity of the product, the clarity of the warnings and the directions, and the ability of the user or purchaser to comprehend and thereby to avoid misuse.

To a limited extent these factors were considered by the Hearing Examiner; but again, we believe he implicitly adopted a test which was more strict than Congress intended. He appears to have accepted the expert's view that "the general public" is incapable of following instructions. That view would justify—indeed, might require—exclusion of all economic poisons from home use. Of greater importance, it is contrary to the premise which Congress must have accepted in the enactment of

FIFRA. A statute which is primarily a regulation of labels necessarily assumes that the general public does heed warnings. We believe a fair respect for the statute requires rejection of a test of misbranding predicated on total illiteracy or universal disregard of instructions.

The adequacy of a label will, of course, be affected by the nature of the message to be conveyed and the ability of the reader to comprehend its meaning. Thus, if a product is not safe unless intricate or esoteric instructions printed in small type are followed with precision, use by laymen, even if reasonably careful, would create an obvious risk of injury to man.[56] On the other hand, a conspicuous "POISON—KEEP AWAY FROM CHILDREN" warning in large red letters, prominently accompanied by skull and crossbones symbols, conveys a message which even the illiterate can understand. Disregard of such a simple warning would certainly constitute gross negligence.

It is not our function, however, to articulate in the first instance the standards which may support a finding of misbranding based primarily on evidence of misuse.[57] The agency must di-

kitchen cupboards which do not have products contained therein which would be extremely detrimental to people if misused. In the case on appeal the evidence amply supports a misuse of the product in the Alamogordo situation. The fact that misuse may result in damage does not in my opinion make a product imminently hazardous in the absence of an evidentiary showing that such misuse is frequent or was reasonably likely to occur." Id. at 1164.

The case was ultimately decided on procedural grounds unrelated to the obvious distinction between proper use and misuse identified by those two judges.

56. Similarly, in our view, respondent has adequate power to require the elimination of possible ambiguity in the labeling of a dangerous product. Thus, for example, if a warning to keep a product away from children was contradicted by a label directing its use in places normally frequented by children, he could require appropriate revisions, such as a more emphatic warning against use if there is any possibility of access by children. In this connection it should be noted that even in tragic instances of "misuse" by small children, the relevant "misuse" to be avoided is that of adults who fail to take proper precaution against the danger that children may have access to the product. If an adult purchaser's use of a product in accordance with directions creates a significant danger of harm to children, obviously the registrant could not defend on the ground that the child was guilty of "misuse."

57. An example of a possible standard is suggested in footnote 6 to the opinion of the Judicial Officer in the proceeding entitled In re Hari Kari Lindane Pellets et al., I.F.&R. Docket No. 6, in which he stated: "Counsel's argument that all lindane products pose a threat of accidental ingestion by children was apparently dismissed on the ground that the Act requires only a label that will be a caution to the hypothetical 'prudent man.'"

rect its attention to that problem in its administration of a statute which is principally a regulation of labels rather than substances. We are persuaded that it has not yet done so but instead has indiscriminately applied a balancing test which is appropriate as a measure of proper use to this case which primarily involves misuse.

We express no opinion on whether the evidence in this record discloses such a probability of misuse of petitioner's product that a finding of "misbranded" would be supportable under standards consistent with FIFRA. Nor, of course, do we express any opinion on the policy issue of whether phosphorous paste should be banned from the home environment regardless of whether or not the products are misbranded within the meaning of FIFRA. We are persuaded, however, that the tests of misbranding, to the extent that they have been articulated, employed in this proceeding go beyond the authority which Congress has delegated to the agency in FIFRA.

In reaching this conclusion we have considered respondent's reliance on the "commonly recognized practice" phrase found in § 135(z) (2) (g), as well as the standard which assumes use in compliance with directions. Perhaps the phrase indicates that whenever misuse occurs with sufficient frequency to be considered a common practice, a finding of misbranding is required. Such an interpretation, however, would attach no significance to the word "recognized." We believe a fair reading of the phrase relates to common practices which are "recognized" in the sense that they are approved by widespread custom or practice.[58] In this case there has been no finding that misuse of Stearns Paste is either a common practice or a commonly recognized practice; furthermore, this provision would be inapplicable to the use of the paste as a rat poison, since subsection (g) does not apply to rodenticides.

We therefore hold that the cancellation orders must be set aside. After developing and articulating standards consistent with the authority delegated by FIFRA for determining when a label inadequately avoids the danger of harmful misuse, respondent may again propose cancellation of petitioner's registrations. Since the propriety of adducing additional evidence cannot be determined until the standards have been articulated, we express no view on whether or not the record should be reopened. We merely hold that petitioner's *prima facie* case has not yet been overcome.

---

Or, as a Hearing Examiner has stated it:
"The labeling of an economic poison deals with the means by which communication is established between the registrant and the user. In bulk, that means a communication by language; and sometimes by symbols. The first step to be taken is a determination of the communicatee—must labels be addressed to those of all ages; to those of all degrees of understanding—, etc. As I see it, FIFRA requires a labeling that has as its communicatee the well-known reasonably-prudent-man. If labeling can be readily and clearly understood by the reasonably prudent man it should suffice to meet FIFRA's obligation to provide protection in the use of an economic poison. . . ." In re Continental Chemiste Corp., I.F.&R. Docket No. 5 (Sept. 20, 1971), p. 9.
We, of course, express no opinion on these or other possible standards.

58. Frequency of misuse might nevertheless demonstrate that the warning statements required by § 135(z) (2) (d) might be inadequate. See the excerpt from Judge Pell's dissent in *Nor-Am* quoted in note 55, *supra.*